Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

August 25, 2026

***By CM/ECF***
The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Mohammad Al-Saadi***
**26 Cr. 220 (CM)**

Dear Judge McMahon:

Mohamed Al-Saadi is a prisoner of war. The government alleges that he is a "commander" in a subsidiary of the Iranian Revolutionary Guard Corp (IRGC) known as Kata'ib Hizballah (KH) who personally associates and coordinates with IRGC's leadership. It charges that Mr. Al-Saadi sought to retaliate after the United States and Israel initiated a military campaign against Iran on February 28, 2026. *See* Indictment ¶ 9; Compl. ¶ 12.

Since Mr. Al-Saadi was presented in this District over three months ago—treated as a common criminal even as the charging documents describe him as a military commander organizing responses to American and Israeli military attacks—he has remained in total solitary confinement with few opportunities for mental stimulation. He is not even permitted to communicate with other prisoners, and he is suffering from the strain of isolation. And while Mr. Al-Saadi was able to purchase a hand crank radio with the assistance of counsel, the radio only plays stations in English—a language Mr. Al-Saadi does not understand. Further, and since the end of June, Mr. Al-Saadi has also been subject to Special Administrative Measures (SAMs) that compound the isolation by restricting his communications to his attorneys, his mother, and his two sisters. The SAMs also limit what he can discuss with these few individuals beyond topics implicating public safety. Based on the SAMs, the government even cut short calls with his family because it did not want him discussing with them the idea of raising public awareness in Iraq and Iran about his wrongful captivity and treatment in this country.

On top of this, Mr. Al-Saadi is struggling enormously with maintaining adequate nutrition. The food that MDC serves is either inedible for religious reasons or comprised of such small portions that it hardly satiates him. And when Mr. Al-Saadi has attempted to supplement his food intake through expensive commissary purchases, his options are

limited and his orders take a substantial amount of time to be fulfilled. Worse, he is often brought items that he did not purchase and meat products that he cannot eat. The hunger pains he experiences are extreme and disruptive. During weekly meetings with counsel, Mr. Al-Saadi regularly complains of migraine headaches, fatigue, and exhaustion. He is unable to concentrate on assisting his counsel with preparing a defense because he is instead focused on his counsel's inability to make progress on getting him adequate food.

The problems Mr. Al-Saadi experiences obtaining food are exacerbated by his mental alienation and lack of stimulation. For example, his attorneys have purchased Arabic language books for Mr. Al-Saadi to help him pass the time between legal visits and maintain cognitive acuity. The books are non-controversial Arabic literature and have been purchased directly from Amazon and other distributors. Inexplicably, however, the books take an inordinate amount of time—more than two weeks—to make their way to Mr. Al-Saadi, which causes him to doubt his counsel's representation that we have purchased the materials for him. Indeed, the defense is still waiting for Mr. Al-Saadi to receive three books of poetry and an Arabic language Bible, the former having arrived at MDC Brooklyn according to Amazon on or about August 3. The defense has no insight into what accounts for the delay, as nothing in the SAMs requires a weekslong review of apolitical literature purchased by his lawyers.

The SAMs, and the indefinite solitary confinement that comes with them, are cruel and excessive. Accordingly, we request that the SAMs be vacated or, alternatively, the following relief:

1. Modest revisions to the language in the SAMs described below to (1) permit Mr. Al-Saadi's counsel freely to discuss any topic with him and (2) permit Mr. Al-Saadi to have reasonable conversations with his mother and sisters, the closest people to him.

2. Access to Arabic language audio and/or visual media through television. This is necessary to mitigate the extreme isolation imposed by the SAMs on a person who cannot understand the English-language media that the Metropolitan Detention Center in Brooklyn (MDC) presently allows him to consume.

3. Access to sufficient commissary purchases to allow for adequate nutrition or, alternatively, permission for counsel to purchase non-perishable, halal food for him from BOP-approved distributors.

# I. Background

## A. The government alleges that Mr. Al-Saadi is a military commander who coordinated attacks on behalf of the IRGC and its proxies to retaliate after the United States and its allies attacked his country earlier this year.

Mr. Al-Saadi is not just a prisoner of war because the defense says so. Rather, the Complaint and Indictment prepared by the United States set forth why Mr. Al-Saadi's conditions of confinement should accord with the Third Geneva Convention's requirements for prisoners of war. According to the pleadings, the precipitating events in this case began on February 28, 2026, when "the United States and Israel launched a large-scale military attack against Iran." *See* Indictment ¶ 9. Since then, the United States and its allies—including Saudi Arabia, the United Arab Emirates, and Israel—have engaged in persistent military strikes and crippling economic sanctions on Iran and its allies in Iraq, Yemen, and Lebanon.[1] According to the Complaint, Mr. Al-Saadi and others sought to respond in kind by attacking American and Israeli facilities. *See* Compl. ¶ 12.

The government alleges that Mr. Al-Saadi, a dual citizen of Iraq and Iran, has a senior role in supporting the IRGC, which it describes as "an Iranian military and counterintelligence agency under the authority of Iran's Supreme Leader." Compl. ¶ 13.a. Iran and its IRGC "use other terrorist and paramilitary proxies in the region to take lethal action and to carry out operations against the United States and its allies." *Id.* ¶ 13.c. One such proxy is KH, *id.*, in which Mr. Al-Saadi was a "commander" who sought to "further[]" the IRGC's "goals." *Id.* ¶ 11. While the United States designated the IRGC a foreign terrorist organization in April 2019 as part of the first Trump Administration's "maximum pressure" campaign against Iran, it is indisputable that the IRGC is an integral part of the Iranian government's military "consist[ing] of an army, a navy, an air force, and an intelligence wing."[2]

KH is part of Iran's "Axis of Resistance," which broadly describes Iranian "efforts, dating back to the 1979 Islamic Revolution . . . to engage proxies, such as [KH] and Hizballah, to fight on behalf of Iran in return for funding, arms, military, training, and intelligence support." Indictment ¶ 5. The Indictment portrays Mr. Al-Saadi as a military and/or paramilitary commander within this network of Iranian military-related entities. *E.g.*, *id.* ¶ 24.a ("Al-Saadi worked closely with Soleimani, the longtime commander of the IRGC-QF"), 24.b (describing photograph of Mr. Al-Saadi in "a military command center");

---

[1] *E.g.*, David Gritten, *Saudi Arabia join US in strikes on Iran-backed militias in Iraq*, BBC (July 29, 2026); Yolande Knell, *Houthis reportedly kill six in first deadly attack since start of Iran war*, BBC (Aug. 11, 2026); Yuka Royer, *Israel resumes military strikes on southern Lebanon as Rome hosts peace talks*, France 24 (Aug. 5, 2026).

[2] *See generally* Adam Zeidan, Encyclopedia Britanica (Aug. 23, 2026), *available at https://www.britannica.com/topic/Islamic-Revolutionary-Guard-Corps.*

24.d (describing photograph of Mr. Al-Saadi "sitting in a formal meeting room in the former 'military intelligence' building for 'the resistance' surrounded by machineguns").

Thus from the time that Mr. Al-Saadi was secretly detained in Turkey on May 1, 2026, at the direction of the United States, held underground for nearly two weeks without access to an attorney or a court, renditioned to the United States in violation of international law, and presented in this District on May 15, 2026 (and up through the present), the United States has been involved in an ongoing international armed conflict with the Iranian military and its proxies, including the proxy that the government alleges Mr. Al-Saadi commands.

The government alleges that Mr. Al-Saadi engaged in the charged conduct as a direct response to the United States' and Israel's February 28, 2026, military strikes on Iran. *See* Ex. A at 2 (SAMs order stating that Mr. Al-Saadi pursued "an eye for an eye, a tooth for a tooth" strategy to respond to attacks by the United States and its allies.).

For example, after the United States and Israel began bombing Iran on February 28, 2026, killing Iran's Supreme Leader Ayatollah Ali Khameini, the spiritual leader for millions of Shiite Muslims worldwide, including Mr. Al-Saadi, Iran then "launched its own offensive against the United States and Israel, including by mobilizing Kata'ib Hizballah and other IRGC proxies . . . to attack U.S. and Israeli interests." Indictment ¶ 9. "Since the start of the Iranian Military Conflict, Al-Saadi has publicly called on others to attack American and Israeli interests, and to kill Americans and Israelis." Compl. ¶ 14.d.

More broadly, "[f]ollowing" the United States' assassination of IRGC leader Qassem Soleimani, to whom Mr. Al-Saadi was purportedly "like a son," Indictment ¶ 20.c, the government alleges that "Al-Saadi has repeatedly incited violence against Americans and the United States and has publicly published many such calls for violence on his social media accounts." *Id.* ¶ 7.

The cause-and-effect pattern continues with attacks on financing sources. Beginning in October 2024, Israel bombed and destroyed civilian buildings in Beirut that it identified as related to Hizballah financiers.[3] The government alleges that, after these attacks by a U.S. ally on targets associated with financing, Mr. Al-Saadi and his networks in turn targeted Israel's financing and foreign support, including in three buildings in the United States, at least one of which is used as a synagogue. Compl. ¶¶ 17.b–17.e (describing effort to start "fires" at New York synagogue and two other U.S.-based Jewish centers that he believed were "staunch supporters of Zionism outside Israel" and "beacon[s] for solidary and support for Israel and its Zionist objectives.").

---

[3] *E.g.*, *Israeli airstrikes in Beirut intensify, demolishing a 10-storey building and striking bridges*, Canadian Broadcast Corporation (Mar. 18, 2026) ("Israel says it targeted Hezbollah's financial arm"); Zoya Awky and Chantal Da Silva, *Israel strikes banks across Lebanon to hit Hezbollah's finances*, NBC News (Oct. 21, 2024) ("The Israeli military hit bank branches across Lebanon overnight to target Hezbollah's finances . . . .").

Notwithstanding the carnage and devastation in Iran and Shiite-led parts of Iraq over the past half year, the government does not allege concrete facts revealing that Mr. Al-Saadi specifically intended to kill anyone at the Jewish centers in this country. It rather alleges that, with respect to similar targets in Europe, Mr. Al-Saadi would be satisfied with merely scarring or "terrorizing" people, rather than killing them. Compl. ¶ 16.b (quoting Mr. Al-Saadi as saying that when, targeting a synagogue and "Zionist headquarters," he does "not have a problem with killing," but "neither do I have a problem with [merely] terrifying" the targets); *id.* ¶ 16.a (alleging Mr. Al-Saadi was "willing to kill people in any" future "attack" without alleging he desired or intended to kill people).

In short, in the middle of a major international armed conflict, the Court is now presiding over an alleged commander in one of the foreign militaries that is a party to the war.

**B. Mr. Al-Saadi has faced unconscionable conditions of confinement at MDC Brooklyn.**

Mr. Al-Saadi was taken into custody by Turkish authorities on May 1, 2026, at the behest of the United States government. We are not aware of the lawful basis for his initial detention: Mr. Al-Saadi was not formally extradited or afforded an opportunity to protest his capture, request bail, or oppose transfer to the United States from Turkey. He was never brought before a Turkish court, allowed to speak with an attorney in Turkey, or even contact his family. Instead, in an unusual rendition procedure, Mr. Al-Saadi was handed over directly to U.S. authorities without an extradition proceeding; based on our understanding, he was detained at one point in a prison in Istanbul and then in the basement of the U.S. embassy in Ankara before being brought to the Southern District New York to be presented on May 15, 2026.

Since his arrival in New York, Mr. Al-Saadi has been placed in total solitary confinement—even before the government issued its memorandum imposing SAMs on June 25, 2026 (**Exhibit A**). As described in our July 22 letter (Dkt. 12), the SAMs have placed Mr. Al-Saadi in total isolation, broken only by visits with his counsel and thrice monthly phone calls with his mother and sister—calls that have been unnecessarily and arbitrarily cut short by the government. The SAMs prohibit Mr. Al-Saadi from communicating even indirectly with relatives outside his immediate family. The social isolation is all consuming. Although Mr. Al-Saadi was able to purchase a hand crank radio, it only plays stations in English—a language that Mr. Al-Saadi does not understand.

In addition, Mr. Al-Saadi has had limited, inadequate access to edible food and insufficient access to hygiene products, including shampoo, which he needs to treat a scalp-related skin condition. We have been in regular contact with the MDC's legal office about Mr. Al-Saadi's adequate access to food and hygiene products, thus far without resolution. Just in the past three days, Mr. Al-Saadi met with counsel and could not focus during the meeting due to a debilitating migraine headache. Counsel spoke with a

correctional officer on the SAMs unit who assured us that his staff would provide Mr. Al-Saadi with Tylenol. When we saw our client a little over 48 hours later, Mr. Al-Saadi reported that he had not been provided any medication.

## II. The government must afford Mr. Al-Saadi the minimum living and confinement conditions required of a prisoner of war.

Because the United States is involved in an international armed conflict in the Middle East, and because the pleadings drafted by the government allege that Mr. Al-Saadi is a commander in one of the adversary militias or militaries—and that his charged conduct was to coordinate responses to American and Israeli military attacks—he should be treated as a prisoner of war rather than as a common criminal in civilian court. Any other conclusion would violate the United States' obligations after it initiates a war, and it would forebode poorly for any of this country's soldiers who face capture in the future by KH, IRGC, or their allies.

### A. The Geneva Convention requires substantial improvements to Mr. Al-Saadi's conditions of confinement.

The Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 135 ("GPW" or "Third Geneva Convention") imposes numerous obligations on a country detaining prisoners of war, the three most pertinent ones here being:

- "Prisoners of war may be interned only in premises located on land and affording every guarantee of hygiene and healthfulness. **Except in particular cases which are justified by the interest of the prisoners themselves, they shall not be interned in penitentiaries.**"[4]

- "The basic daily food rations shall be sufficient in quantity, quality and variety to keep prisoners of war in good health and to prevent loss of weight or the development of nutritional deficiencies."[5]

- "Prisoners of war shall be allowed to send and receive letters and cards. If the Detaining Power deems it necessary to limit the number of letters and cards sent by each prisoner of war, the said number shall not be less than two letters and four cards monthly, exclusive of the capture cards provided for in Article 70, and conforming as closely as possible to the models annexed to the present Convention**. Further limitations may be imposed only if the Protecting Power is satisfied that it would be in the interests of the prisoners of war concerned to do so owing to difficulties of translation caused by the Detaining**

[4] GPW, Article 22 (emphasis added)
[5] *Id.* Article 26

**Power's inability to find sufficient qualified linguists to carry out the necessary censorship.**"[6]

Implementing these three provisions of the Third Geneva Convention would mean that the government cannot interfere with Mr. Al-Saadi's ability to discuss or correspond with his family about topics directly related to his detention, including raising awareness for his plight among the people of Iran and Iraq and sending his love to other relatives. It would also mean that the government could not cut his calls with his family short simply because Mr. Al-Saadi is discussing other topics with his family, including issues related to their physical, financial, and mental health. Lastly, it would also require BOP to move Mr. Al-Saadi to a more humane environment than the so-called "KD" isolation unit at MDC.

### B. Mr. Al-Saadi qualifies for treatment under the Geneva Convention.

The United States signed and ratified the Third Geneva Convention over one-half century ago. Through this motion, Mr. Al-Saadi does not presently move for combatant immunity—or any relief other than the improvement to the conditions of confinement to which he is entitled under the United States' binding treaty obligations. Of course, Mr. Al-Saadi reserves the right to make those motions later and formally seek combatant immunity subject to a formal Rule 12 motion schedule.

The government does not consider Mr. Al-Saadi to be a prisoner of war. Where the parties disagree and there is a dispute over a foreign combatant's status, Article Five requires that the combatant be treated as a prisoner of war until their status is adjudicated and resolved. GPW art. 5, 6 U.S.T. at 3322-24, 75 U.N.T.S. at 140-42 ("Should any doubt arise" as to whether a detainee is a POW, "**such person shall enjoy the protection of the Convention until such time as their status has been determined by a competent tribunal.**") (emphasis added).

Thus, in this case, the government must afford Mr. Al-Saadi the rights entitled to prisoners of war under the Third Geneva Convention while his status is litigated. Mr. Al-Saadi will, in due course based on the Court's motion schedule, brief in full why he falls within Article Four of the Third Geneva Convention, which classifies as prisoners of war three categories, all of which apply here: (1) members of "armed forces of a Party to the conflict as well as members of militias . . . forming part of such armed forces"[7]; (2) "[m]ember of a regular armed forces who profess[es] allegiance to a government or an authority not recognized" by the United States[8]; and (3) "[m]ember of other militias [*i.e.*, KH] . . . including those of organized resistance movements, belonging to a Party to the conflict" with a command-subordinate structure.[9]

---

[6] *Id.* Article 71 (emphasis added).
[7] *Id.* Article 4 ¶ 4A(a)(1).
[8] *Id.* Article 4 ¶ 4A(a)(3).
[9] *Id.* Article 4 ¶ 4A(a)(2).

The government's own pleadings create a plausible basis for determining that Mr. Al-Saadi falls within each of these categories: they allege that he is a commander in KH (Comp. ¶ 11), which is an organization with an identifiable flag (*id.* ¶ 13.d); one that openly carries arms (Indictment ¶¶ 22-23) and conducts operations in accordance with the laws and customs of war. Indeed, it is well-established that conspiracies like the ones charged here do not violate the laws and customs of war. *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 260 (2d Cir. 2009) ("As to conspiracy as an inchoate offense, the Supreme Court held in *Hamdan v. Rumsfeld*, 548 U.S. 557, 610 723 (2006), that 'the only conspiracy crimes that have been recognized by international war crimes tribunals . . . are conspiracy to commit genocide and common plan to wage aggressive war.'"). The pleadings allege that Mr. Al-Saadi, KH, and IRGC all sought to retaliate against the United States and Israel following the February 2026 bombing campaign initiated by their forces—a campaign that included the United States' bombing of a girls' elementary school in Tehran on February 28, 2026, which killed 156 people, including 120 innocent children. To be sure, nothing in the government's allegations against Mr. Al-Saadi as a commander within KH suggests he has ever sought to respond in kind.

In short, Mr. Al-Saadi—as a commander in a foreign military or militia with which the United States is presently engaged in an ongoing international armed conflict—should be held as a prisoner of war in accordance with the Third Geneva Convention until such time as his status can be adjudicated.

## III. Mr. Al-Saadi should not be subjected to SAMs.

Even if he is not treated as a prisoner of war, the Court should vacate Mr. Al-Saadi's SAMs. After holding Mr. Al-Saadi in custody for over one month without incident, and without any basis to conclude that he could not be safely detained under ordinary (and still onerous) confinement conditions at MDC, the government on June 25, 2026, issued a memorandum imposing SAMs. The SAMs are improper, however, because they were imposed based on a purely speculative risk that Mr. Al-Saadi's communications with third parties would pose a risk to public safety. These limitations, without any facts supporting their necessity, contravene the Fifth Amendment's Due Process Clause and the Sixth Amendment right to effective representation by counsel.

### A. Regulatory Background

28 C.F.R. § 501.3(a) authorizes the government to impose "special administrative measures" on a defendant to prevent "acts of violence and terrorism." Such administrative measures "may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." *Id.*

**B. The SAMs as imposed violate the regulatory framework and the Fifth, Sixth, and Eighth Amendments to the Constitution.**

The government's memo imposing SAMs on Mr. Al-Saadi asserted no misconduct by him within the Bureau of Prisons, or any prison. It instead summarizes what it alleges he did before his arrest—but every pretrial detainee is accused of engaging in some kind of harmful pre-arrest conduct, so this is no basis at all to impose SAMs.

Reflecting the pleadings, the SAMs memorandum contends that Mr. Al-Saadi is a commander in KH and affiliated with the IRGC who sought "an eye for an eye, a tooth for a tooth" Biblical-style[10] revenge against the United States and Israel since those two countries attacked Iran on February 28, 2026, and assassinated senior government leaders; that he called for targeting President Trump as President Trump targeted his alleged surrogate father Qassem Soleimani, and Shiite religious leader, Ayatollah Khameini; that he was a prolific social media poster; and that he has "demonstrated ability to disseminate propaganda that explicitly calls for violence against Americans and others." Ex. A at 2-4. The government contends that these alleged actions and the crimes he has been charged with warrant Mr. Al-Saadi's extreme isolation and limitations on how defense counsel may conduct themselves and prepare a defense, pursuant to 28 C.F.R. § 501.3. None of this is conduct that can be continued within a federal prison, even absent SAMs.

Consequently, the SAMs are unwarranted because they are not supported by information sufficient to trigger 28 C.F.R § 501.3 (requiring a finding "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons"). And since they are not reasonably related to any regulatory interests, the SAMs amount to unconstitutional punishment. *See Bell v. Wolfish*, 441 U.S. 520, 539 (1979) (holding that "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees."). Finally, the SAMs also baselessly constrain the defense team's investigation and preparation of a defense in violation of Mr. Al-Saadi's Sixth Amendment rights.

SAMS only pass constitutional muster if the Court finds they address the legitimate penological and public safety concerns 28 C.F.R. § 501.3 was designed to address. *See Turner v.* Safley, 482 U.S. 78, 87 (1987). The purpose of SAMs is to protect witnesses and ensure public safety based on a non-speculative risk that an individual detainee would abuse his third-party communications to promote acts of violence from behind bars.

The Constitution does not tolerate punitive pre-trial confinement, and the Supreme Court distinguishes between "punitive measures that may not constitutionally be imposed

[10] Exodus 21:23–25.

prior to a determination of guilt and regulatory restraints that may." *See generally Bell*, 441 U.S. at 537.[11] Accordingly, upon a pre-trial detainee's challenge to his confinement conditions, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538 (internal citations omitted). And "if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees." *Id.* at 539.

The seminal Second Circuit case on SAMs concerned a clear and demonstrated inability to protect the public from a *convicted* inmate absent especially restrictive measures. *United States v. Felipe*, 148 F.3d 101, 111 (2d Cir. 1998). In *Felipe*, the defendant was a high-ranking gang leader who ordered multiple murders from inside prison; the Second Circuit assessed that "given the opportunity, appellant would likely continue such legal activity." *Id.* Thus, the SAMs order was constitutional upon a record with concrete facts demonstrating that the incarcerated individual's communications with third parties posed a danger to others– both inside and outside the prison.

Applying *Turner*, *Felipe* identified four factors to consider when assessing the constitutionality of SAMs:

> (1) a "valid, rational connection" exists between the regulation and the purported governmental interest; (2) alternative means of exercising a constitutional right remain available to a prisoner; (3) the accommodation of the right will have a significant impact on the prisoner's fellow inmates, prison staff or prison resources; and (4) ready alternatives to the regulation exist that would not impinge on the prisoner's rights.

*Id.* at 110 (quoting *Turner*, 482 U.S. at 89-90); *accord United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000). In the context of pre-trial detention, the four-factor test carries a caveat: because punishment and rehabilitation are not legitimate governmental objectives

---

[11] *See also Fischer v. Winter*, 564 F. Supp. 281, 298 (N.D. Cal. 1983) ("Since sentenced inmates may be held under conditions that are punitive, while pretrial inmates may not be, the courts have said that the due process clause affords greater protection to unsentenced inmates than the Eighth Amendment affords to the convicted."); *Reece v. Gragg*, 650 F. Supp. 1297, 1300 (D. Kan.1986) ("Sentenced inmates may be held under conditions that are punitive, while pretrial detainees may not be because they are still cloaked with presumption of innocence."); *Women Prisoners of D.C. Dep't of Corrs. v. District of Columbia*, 877 F. Supp. 634, 664 n.38 (D.D.C.1994) ("Whereas convicted [prisoners] bring a cause of action under the Eighth Amendment, pretrial detainee[s][ ] rely upon the Fifth Amendment guarantee of due process. Though the unconstitutional conditions may be the same, the threshold for establishing a constitutional violation is clearly lower for pretrial detainees." (quotation marks and internal citations omitted)).

for pre-trial detainees, the "legitimate penological interests" served by a particular measure must go "beyond the traditional [carceral] objectives of rehabilitation and punishment." *El-Hage*, 213 F.3d at 81.

As to the test's first factor—the "rational" connection between the regulation and purported government interest—*Felipe* found the "sever[e]" restrictions "necessary under the circumstances" where the defendant had been found to have ordered murders on a prison phone. *Id.* There are no remotely comparable circumstances here. Mr. Al-Saadi showed no proclivity, prior to the SAMs imposition, to direct murderous activity from MDC Brooklyn. This lack of evidentiary support for the SAMs also weighs on the third factor: there is no record upon which to conclude that allowing Mr. Al-Saadi to roam freely on an ordinary—and still confined—MDC jail unit, and to call his family daily, would impact his fellow prisoners or the public at large.

Further, unlike the defendant in *Felipe*, Mr. Al-Saadi does not, as a practical matter, retain the right to "communicate with prison employees (including pastoral, medical, and educational department staff)," *id.* at 110-11, because he does not speak English. He is thus far more isolated and harmed by the imposition of SAMs. That in turn heightens the due process denial—the SAMs create harsher conditions even though they are imposed based on a flimsier record.

Finally, there are ready alternatives—namely confining Mr. Al-Saadi to recorded MDC phone calls like other high-profile prisoners in the building, including Nicolás Maduro, who until eight months ago was the president of Venezuela, a nearby nation, and Sam Bankman-Fried, who was accused of obstructing justice before his bail was revoked.

It is particularly notable that the government has used the SAMs in this case to terminate a family phone call on July 13, 2026, after Mr. Al-Saadi asked his family to raise awareness about his plight in Iraq and Iran, to encourage leadership in those countries to demand his release. Curtailing a prisoner's ability to discuss *his own prosecution*—either with his family or the public at large—violates core First Amendment rights. *See United States v. Sattar*, 395 F. Supp. 2d 79, 102-03 (S.D.N.Y. 2005) (affirming conviction where defendant spoke in furtherance of a conspiracy to murder "rather than having merely engaged in advocacy" concerning his case). The United States may "proscribe subversive advocacy only when such advocacy is directed towards, and is likely to result in, 'imminent lawless action.'" *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999) (quoting *Brandenburg v. Ohio,* 395 U.S. 444 (1969) (per curiam)). Raising awareness about a prisoner's plight—or, as in this case, telling one's family to "hold tight" for him—is not incitement under *Brandenburg*, nor is it a threat or an obscenity or any other manner of speech that the government may constitutionally prohibit Mr. Al-Saadi from conveying. And because it plainly does not create a risk of death or serious injury, it thus also fails to meet the regulatory standard for imposing SAMs.

### C. In the alternative, even if the Court permits SAMs to remain, the SAMs here should be modified.

In the alternative, if the Court does not order the government to vacate the SAMs and/or to treat Mr. Al-Saadi as a prisoner of war, then certain modifications and improvements to his living conditions are necessary to comport with the Fifth, Sixth, and Eighth Amendments. These fall broadly into two buckets. First, revisions to the SAMs conditions. Second, provision of reasonable accommodations to improve the conditions created by the SAMs.

#### 1. Absent amendment, the SAMs curtail Mr. Al-Saadi's Sixth Amendment right to effective representation by counsel.

The SAMs, as written, could be construed as prohibiting counsel from even reviewing certain discovery with Mr. Al-Saadi, which is inconsistent with the protective order issued in this case. Attached hereto as **Exhibit B** is the defense's proposed redline. In particular, the following language should be revised:

**Paragraph 2.h** (Ex. A at 9). By listing the types of documents that Mr. Al-Saadi's *counsel* may review with him (*e.g.*, "discovery materials" and "court papers"), the SAMs creates ambiguity about whether defense counsel may review with Mr. Al-Saadi any materials that are not firmly within the listed categories. Our redline therefore proposes eliminating these confining examples and leaving Mr. Al-Saadi's counsel, as officers of the Court, with discretion to share any materials with him that we believe necessary during a counsel visit. Leaving the ambiguity in place creates intolerable pressure and risk for defense counsel given the criminal penalties that the government could seek to impose for violating the SAMs.[12]

**Paragraph 2.h.i** (Ex. A at 9). This paragraph states that "[n]one of the materials provided" to Mr. Al-Saadi "may include inflammatory materials" or other types of materials that arguably exist throughout (a) the discovery and (b) related materials that the defense may wish to review with Mr. Al-Saadi before offering at trial. Indeed, as written, this provision ambiguous as to whether it modifies the prior paragraph to curtail counsel from sharing even discovery materials if they are "inflammatory."

This kind of ambiguity is pernicious and destructive to the attorney-client relationship: counsel faces the risk of criminal prosecution if the SAMs are violated and cannot risk running afoul of these ambiguous provisions. As a result, revising and clarifying the language is necessary to allow us to provide Mr. Al-Saadi with effective assistance.

[12] This concern is hardly abstract. The prosecution of defense attorney Lynne Stewart (and the ten-year sentence she received) in connection with her representation of the so-called Blind Sheikh, who was also subjected to SAMs, remains a potent illustration of the risks associated with representing SAMs detainees.

The defense's proposed revision (Ex. B) thus distinguishes between these two categories of information—materials and information shared and discussed during counsel visits, on the one hand, and materials and information discussed during family calls, on the other. The defense proposal clarifies that counsel may share any material with Mr. Al-Saadi that counsel believes is necessary for the defense.

Finally, the term "inflammatory materials" should be struck from the SAMs. It is undefined, vague, and creates intolerable ambiguity. Counsel and Mr. Al-Saadi's family cannot operate under the risks created by ambiguity in the SAMs.

**Paragraph 2.h.ii** (Ex. A at 9). The defense seeks to add a provision—like those in protective orders—that it may seek *ex parte* leave of the Court to provide Mr. Al-Saadi with any materials arguably barred by the SAMs.

**Paragraph 3.b.i** (Ex. A at 10). The defense seeks to add language to clarify that neither counsel nor Mr. Al-Saadi's family are responsible if a third party outside of their control listens to communications.

**Paragraph 3.e.** The defense seeks to add language making clear that Mr. Al-Saadi is not precluded from asking his family to raise public awareness about his plight.

### 2. Other reasonable accommodations are necessary.

We respectfully request other accommodations to address the painful isolation that the government has imposed without any record of Mr. Al-Saadi creating danger from within a jail. The level of mental anguish created by solitary confinement is hard to overstate. The Third Circuit has powerfully described the torturous effects that this kind of isolation have on a person, here someone detained pretrial and presumed innocent:

> A comprehensive meta-analysis of the existing literature on solitary confinement within and beyond the criminal justice setting found that "[t]he empirical record compels an unmistakable conclusion: this experience is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage." Specifically, based on an examination of a representative sample of sensory deprivation studies, the researchers found that virtually *everyone* exposed to such conditions is affected in some way. They further explained that "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." And as another researcher elaborated, "all [individuals subjected to solitary confinement] will . . . experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli."
>
> Anxiety and panic are common side effects. Depression, post-traumatic stress disorder, psychosis, hallucinations, paranoia, claustrophobia, and

> suicidal ideation are also frequent results. Additional studies included in the aforementioned meta-analysis further "underscored the importance of social contact for the creation and maintenance of 'self.'" In other words, in the absence of interaction with others, an individual's very identity is at risk of disintegration.

*Williams v. Sec'y Pennsylvania Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017) (emphasis in original and internal citations omitted).[13]

Indeed, "[t]he effects of long-term solitary confinement mirror the effects of other forms of torture: anxiety, panic, paranoia, hallucinations, self-mutilation, and suicide."[14] "These behaviors are believed to be maladaptive mechanisms for dealing with the psychological suffering that comes from isolation." *Williams*, 848 F.3d at 568 (internal citations omitted). Further, "the lack of opportunity for free movement is [also] associated with more general physical deterioration . . . includ[ing] dangerous weight loss, hypertension, and heart abnormalities, as well as the aggravation of pre-existing medical problems." *Id.* (internal citations omitted).

In this case, even though it has no record or examples of Mr. Al-Saadi engaging in murderous, behavior while in United States custody, the SAMs impose harsher isolation than the Second Circuit affirmed in *Felipe*, where the presumably English-speaking defendant was still able "communicate with prison employees (including pastoral, medical, and educational department staff)." 148 F.3d at 110-11. Based on the language barrier here, the SAMs deny Mr. Al-Saadi even that amount of human contact.

To ameliorate these terrible and inhumane consequences of isolation, we respectfully request the following:

1. Provision of a television with Arabic-language programming that Mr. Al-Saadi can watch and remain engaged. This is necessary to mitigate against the psychological torture of the isolation – isolation imposed absent any misbehavior on the part of Mr. Al-Saadi while he has been in prison. Indeed, BOP is able to accommodate this request, as even SAMs prisoners at ADX Florence have individual televisions in their cells.

2. Bi-weekly phone calls with Mr. Al-Saadi's relatives. This will further mitigate the effects of isolation. It will also allow Mr. Al-Saadi's time with his

---

[13] *See also Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) ("Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances.").

[14] Center for Constitutional Rights & Yale Law School Lowenstein International Human Rights Clinic, The Darkest Corner: Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons, at 12 (Sept. 14, 2017), available at: https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf.

counsel to be more productive. At present, Mr. Al-Saadi's legal visits are consumed addressing concerns about the SAMs and their psychological impact. Increasing Mr. Al-Saadi's access to his family will thus also allow him to have more productive interactions with his counsel, which is necessary for us to provide effective representation and prepare a defense strategy with his input and assistance.

3. We also request permission for Mr. Al-Saadi to purchase more food from commissary. The items currently available to Mr. Al-Saadi via commissary are limited and fewer than those available to the general jail population. We have raised with MDC and the government our concerns that Mr. Al-Saadi is unable to adequately supplement his food intake through commissary. If the MDC believes it must impose limits on Mr. Al-Saadi's commissary purchases, we are able to provide food to him ourselves and can send Mr. Al-Saadi non-perishable food items from BOP-approved food distributors.

## IV. Conclusion

The Court should (1) order that Mr. Al-Saadi be detained in accordance with the Third Geneva Convention and (2) vacate the SAMs. In the alternative, it should revise the SAMs as proposed above.

Respectfully Submitted,

Andrew John Dalack, Esq.
Benjamin Silverman, Esq.
Assistant Federal Defenders
Tel: (646) 315-1527

Cc: Counsel of record (by ECF)
Mohammed Al-Saadi (by legal mail)