**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 28, 2026

**By ECF**
The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Mohammad Baqer Saad Dawood Al-Saadi*, 26 Cr. 220 (CM)**

Dear Judge McMahon:

The Government respectfully submits this letter in opposition to defendant Mohammad Baqer Saad Dawood Al-Saadi's letter motion, dated August 25, 2026, to vacate, or in the alternative, modify, the Special Administrative Measures ("SAMs") (Dkt. 14 (the "Motion")). As set forth below, the defendant has been a member of Kata'ib Hizballah, a U.S. designated foreign terrorist organization ("FTO") operating in Iraq that is closely aligned with the Islamic Revolutionary Guard Corps ("IRGC") and has furthered the terrorist goals of those groups since at least in or about 2017. Most recently, between March and April 2026, the defendant directed and/or promoted at least 18 terrorist attacks against civilians and civilian targets across Europe and attempted to attack a synagogue in Manhattan. The defendant himself has explained that he is responsible for media and propaganda operations on behalf of FTOs intent on promoting and carrying out terrorist acts against civilians in the United States and abroad. Notably, since the defendant's arrest in this case, and his placement on SAMs, the types of terrorist attacks which the defendant is alleged to have directed and promoted earlier this year have ceased. Put simply, the defendant was—and remains—a grave national security threat and his access to others who could harm civilians must be limited. As a result, the Attorney General appropriately imposed the SAMs, concluding that there is a substantial risk that the defendant's contacts and communications with third parties could lead to additional terrorist acts.

The defendant nevertheless argues that he should not be subject to the SAMs because "they were imposed based on a purely speculative risk that [his] communications with third parties would pose a risk to public safety." (Dkt. 14 at 8). The SAMs "limitations," the defendant argues, "without any facts supporting their necessity, contravene the Fifth Amendment's Due Process Clause and the Sixth Amendment right to effective representation by counsel." (*Id.*). The defendant is wrong. As described further below, the SAMs were imposed based on factors that underscore the danger the defendant poses even while detained pending trial, including the vast and global nature of the FTOs that the defendant supports; the nearly 20 actual terrorist attacks that the defendant was able to facilitate and promote; the efforts the defendant has undertaken to encourage others to participate in acts of violence against anyone who supports America and Israel; the defendant's extensive use of social media, electronic devices, and encrypted messaging

applications to spread the FTOs' terrorist ideology and violent aims; and his ongoing desire to commit terrorist acts here and abroad.

Because the defendant cannot meaningfully challenge the bases for the SAMs, his constitutional challenge also fails. There is a valid, rational connection between the SAMs and the Government's national security interest in limiting the defendant's contact with others who could carry out, or facilitate and encourage others to carry out, acts of terrorism. Critically, while the SAMs impose limits on the defendant's non-legal communications, they appropriately permit him to meet with counsel and review discovery to prepare his defense and to communicate and visit with his family members. In similar circumstances, the Second Circuit and courts across the country have consistently denied constitutional challenges to SAMs such as those raised here. *See, e.g.*, *United States v. El-Hage*, 213 F.3d 74 (2d Cir. 2000); *United States v. Mohamed*, 103 F. Supp. 3d 281 (E.D.N.Y. 2015); *United States v. Basciano*, 763 F. Supp. 2d 303 (E.D.N.Y. 2011), *aff'd*, 634 F. App'x 832 (2d Cir. 2015); *United States v. Hashmi*, 621 F. Supp. 2d 76 (S.D.N.Y. 2008); *United States v. Kassir*, No. S2 04 CR. 356 (JFK), 2008 WL 2695307 (S.D.N.Y. July 8, 2008).

At bottom, the SAMs imposed on the defendant are reasonably related to serious security concerns arising out of the defendant's dangerousness and desire to spread a violent ideology, as well as his connections to FTOs and individuals who could engage in widespread terrorist attacks across the globe. The limitations currently imposed on the defendant promote a valid public interest in preventing additional terrorist acts. For these reasons and those set forth below, the defendant's motion to vacate, or in the alternative to modify, the SAMs should be denied.

## I. Background

### A. The Charged Offenses and the Defendant's Arrest

The defendant is charged in an eight-count indictment with (1) conspiracy to provide material support to a foreign terrorist organization, specifically Kata'ib Hizballah, in violation of 18 U.S.C. § 2339B, (2) conspiracy to provide material support to a foreign terrorist organization, specifically the Islamic Revolutionary Guard Corps (the "IRGC"), in violation of 18 U.S.C. § 2339B, (3) conspiracy to provide material support for acts of terrorism, specifically attempting and conspiring to murder nationals of the United States and bombing and conspiring to bomb a place of public use, in violation of 18 U.S.C. § 2339A, (4) providing material support for acts of terrorism, specifically attempting and conspiring to murder nationals of the Unites States and bombing and conspiring to bomb a place of public use, in violation of 18 U.S.C. § 2339A, (5) attempted acts of terrorism transcending national boundaries, in violation of 18 U.S.C. § 2332b, (6) conspiracy to bomb a place of public use, in violation of 18 U.S.C. § 2332f, (7) attempted destruction of property by means of fire or explosive, in violation of 18 U.S.C. § 844(i), and (8) financing terrorism, in violation of 18 U.S.C. § 2339C. *See* Dkt. 6.

As described in further detail in the Indictment and below, the charges stem from the defendant's role working with and on behalf of FTOs, including Kata'ib Hizballah and the IRGC, and his involvement in planning and promoting nearly 20 terrorist attacks and attempted attacks against civilian targets in Europe and the United States between in or about March and April 2026.

On or about May 1, 2026, the defendant was detained in Turkey. He was transferred to the custody of the FBI on May 14, 2026, and then brought to the United States and presented in this District on or about May 15, 2026. During his transport to the United States, and as described further below, the defendant waived his *Miranda* rights and made numerous admissions about his involvement with FTOs, close relationship with IRGC leadership, and role in promoting terrorist attacks, including those described in the Indictment.

**B. The IRGC and Kata'ib Hizballah**

As alleged in the Indictment, the IRGC is an Iranian military and counterintelligence agency under the authority of Iran's Supreme Leader. Since its inception more than 45 years ago, the IRGC has engaged in terrorist activity around the world, including plotting to kill and killing U.S. citizens, and has played a central role in Iran becoming the world's foremost state sponsor of terrorism. *See* Dkt. 6 at ¶ 4. The IRGC supports the lethal activities and shared terrorist goals of several Iranian proxy organizations, including Kata'ib Hizballah, Hizballah, and other terrorist groups, which receive training, funding, and weapons from the IRGC, including through the IRGC Quds Force ("IRGC-QF"). *Id.* The IRGC-QF is the IRGC's external operations force and the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. *Id.* In 2019, the U.S. Department of State designated the IRGC, including the IRGC-QF, as an FTO. *Id.*

Kata'ib Hizballah is an Iraq-based Shia Islamic terrorist group whose goal is to establish an Iran-aligned government in Iraq, expel American forces from Iraq, and advance the regional and international interests of Iran in Iraq and the region. *See* Dkt. 6 at ¶ 5. Kata'ib Hizballah, which was designated as an FTO in 2009, has received extensive training, funding, logistical support, weapons, and intelligence from the IRGC-QF. *Id.*

On or about February 28, 2026, the United States and Israel launched a large-scale military attack against Iran (the "Iranian Military Conflict"). *See* Dkt. 6 at ¶ 9. In response, Iran launched its own offensive against the United States and Israel, including by mobilizing Kata'ib Hizballah and other IRGC terrorist proxies around the world, to attack U.S. and Israeli interests. *Id.* For example, since the onset of the Iranian Military Conflict, a purportedly new terrorist group using the pseudonym Harakat Ashab al-Yamin al-Islamiya ("Harakat"), carried out numerous terrorist attacks against civilians and civilian targets in Europe on behalf of and in coordination with Kata'ib Hizballah and other FTOs. *Id.* at ¶ 11.

**C. The Defendant's Roles in the IRGC and Kata'ib Hizballah**

As alleged in the Indictment, the defendant is a commander in Kata'ib Hizballah with close ties to the IRGC. *See* Dkt. 6 ¶ 6. The defendant has been directly involved in those FTOs' terrorist activity and operations, including by communicating with senior IRGC leadership about military decisions, discussing attacks on U.S. interests with other members of Kata'ib Hizballah, coordinating and directing terrorist attacks, and promoting propaganda on behalf of both FTOs to encourage violence against U.S citizens and interests. *Id.* In those roles, the defendant has worked with U.S.-designated terrorist leaders, including Esmail Qaani, the commander of the IRGC-QF, and Naim Qassem, the Secretary General of Hizballah. *Id.* The defendant also worked closely

with Qassem Soleimani and Abu Mahdi al-Muhandis, the former leaders of the IRGC-QF and Kata'ib Hizballah, respectively, before they were killed in a U.S. airstrike in or about 2020. *Id*. at ¶ 7.

Following their deaths, the defendant repeatedly sought to incite violence against Americans and published many such calls for violence on his social media accounts. *See, e.g.*, Dkt. 1 at ¶ 14. For example:

- In or about 2020, the defendant published, among others, images on his social media accounts of (i) the U.S. capital in rubbles projected against the faces of Soleimani and al-Muhandis, with the text "our revenge for the martyred leaders is ongoing. No negotiations with the occupier"; and (ii) an individual dressed in uniform sitting next to an AK-47 rifle, holding a picture of Soleimani and al-Muhandis, with the caption, "I will leave social media and turn off all my phones until the American enemy is defeated [--] victory or martyrdom." Dkt. 1 at ¶ 14(c)(ii).

- In or about 2021, the defendant posted a photograph on one of his social media accounts of himself and Soleimani accompanied by captions that read, among other things, in English, "en [sic] entire world will avenge you," and in Arabic, "An eye for an eye, a tooth for a tooth, and coming to Washington and Florida." Dkt. 1 at ¶ 14(c)(v).

- In or about 2023, the defendant posted an image of President Trump playing golf and the shadow of what appears to be a B-2 bomber hovering over him, with the text, "retribution must be exacted from the instigators and killers of Martyr Soleimani." Dkt. 1 at ¶ 14(c)(vi).

- In or about 2026, the defendant posted a message in Arabic, which read in part, "Do not abandon the blood of your Imam of the time, oh Shiites of Iraq. Kill everyone who supports America and Israel. Do not leave any of them remaining. Civil and military targets, as well as voices of discord, kill them everywhere." That same day, the defendant also posted on social media a call to arms to attack Americans and Jews. The message, which was posted in Arabic, stated, among other things: "every individual or group capable of killing an American or Zionist target, whether civilian or military, in any country of the world, should begin by targeting them." Dkt. 1 at ¶¶ 14(d)(i)-(ii).

Additional evidence of the threat the defendant poses was recovered from his phone that was seized upon his arrest in May 2026. *See* Dkt. 6 at ¶¶ 21-24. For example, in a photo dated February 12, 2024, the defendant was standing in front of an array of machineguns in a conference room that the defendant, in his post-arrest interview, stated was located in a building that at the time was used for "military intelligence" for "the resistance." Dkt. 6 at ¶ 23(b). The room had a map on the wall of what appears to be the United States accompanied by a list of "legitimate targets" identifying prominent former and current U.S. officials. *Id.*

**D. The European Terrorist Attacks**

Since the Iranian Military Conflict began, the defendant has publicly called on others to kill American and Jewish civilians. As part of that mobilization, on or about March 7, 2026, the

defendant posted a public message online, titled "Shadow soldiers," which appeared to call to action terrorist cells: "To all jihadens people in weast ,east [sic] earth…Its permission to all silent cells (R362 – C357 – A351) For work." Dkt. 6 at ¶ 10.

Two days later, the first of approximately 18 terrorist attacks in Europe against U.S. and Jewish civilian targets (the "European Terrorist Attacks") was carried out on behalf of and in coordination with Kata'ib Hizballah and other U.S. designated FTOs, including under the defendant's command. Dkt. 6 at ¶ 11. In an apparent effort to conceal their involvement, Kata'ib Hizballah and the related FTOs carried out the attacks using a purportedly new terrorist group, Harakat, which was a front for Kata'ib Hizballah and related terrorist organizations. *Id*. at ¶¶ 11, 25(f). That day, the defendant posted on one of his social media accounts a message with Harakat's logo, calling on "warriors of Islam" to engage in "jihad," or violent holy war. *Id*. at ¶ 12.

From on or about March 9, 2026, up until on or about April 29, 2026, Harakat claimed responsibility for approximately 18 terrorist attacks that were carried out in various cities across Europe, against U.S. and Jewish targets. Dkt. 6 at ¶ 14. The attacks involved arson and/or explosives, and in one instance, a near-fatal stabbing in London against two Jewish men, including a dual U.S.-British citizen. *Id*. at ¶ 13. Harakat claimed credit for these attacks in propaganda videos that the defendant helped create and publish online. *Id*. at ¶ 14. Those videos appear to have been intended, in part, to sow fear among civilians, as part of the defendant's efforts to engage in "psychological warfare" against civilians. *Id*. at ¶ 15.

Evidence recovered from the defendant's phone underscores his personal involvement in these attacks. For example, a video recovered from the defendant's phone dated on or about April 18, 2026—that is, the day of an arson attack against a synagogue in London—shows the defendant in a dark room with other men. *See* Dkt. 6 at ¶ 25(e)(iv). In the video, the men are on a FaceTime video call with one of the individuals who was about to carry out the London attack, which is projected onto a large screen against the background of the Harakat logo. *Id*. The video shows the defendant recording the attack. *Id*. In the video, one of the men, in English, instructs the individual on the other end of the call to execute the arson attack, directing that individual to take a lighter and "light one in your hand," "light it" and "throw the fourth one." *Id*. Below is a screenshot from the video, with the defendant (circled in red) filming the attack:



The defendant also used his online platforms to preview and promote the attacks. For example, on or about March 21, 2026, and on or about March 23, 2026, the defendant sent images of Harakat's logo, including an image accompanied by a map of Europe and a clock appearing to depict a count-down of 24 hours below the map, with the caption "European Frontier[:] featuring [Movement of the Companions of the Right]." Dkt. 6 at ¶ 25(a). The defendant had publicly posted the same image on his Telegram account approximately ten days earlier, on or about March 14, 2026; an explosive attack against a Jewish school in Amsterdam, Netherlands, for which Harakat claimed responsibility, occurred the next day. *Id*.

Moreover, from at least on or about March 7, 2026, to on or about May 1, 2026 (*i.e.*, the day the defendant was arrested in Turkey), the defendant regularly communicated with another individual, saved in his phone as "Haji Musa Kata'ib Hizballah" (the "Kata'ib Hizballah Musa Contact"), regarding Harakat and the European Terrorist Attacks. Dkt. 6 at ¶ 25(f). For example:

- On or about March 8, 2026, the defendant wrote to the Kata'ib Hizballah Musa Contact that "[t]he most important thing is that within the psychological warfare, they [referring to Harakat's messages] are useful," and that "anything that distracts the enemy is useful." Dkt. 6 at ¶ 25(f)(v).

- On or about March 8, 2026, the defendant wrote to the Kata'ib Hizballah Musa Contact that he had a "poll on Belgium" that was "very strong," and that it was "really time now." The next day, on or about March 9, 2026, there was a terrorist attack in Belgium for which Harakat claimed responsibility. Dkt. 6 at ¶ 25(f)(vi).

- On or about April 29, 2026—the day two men were stabbed in London in an attack for which Harakat claimed responsibility, the defendant instructed the Kata'ib Hizballah Musa Contact to "post it in the news[,] important," referring to video footage of that attack,

including a propaganda video that Harakat posted in which it claimed responsibility for that attack. That same day, the defendant sent the following message to the Kata'ib Hizballah Musa Contact: "If God grants us success tonight, there will be a shooting at a restaurant." Dkt. 6 at ¶ 25(f)(viii).

**E. Attempted Terrorist Attacks in the United States**

In addition to the European Terrorist Attacks, in or about April 2026, the defendant attempted to coordinate and carry out terrorist attacks to kill civilians in the United States, including by targeting a synagogue in Manhattan, and other Jewish institutions across the country.

Specifically, in or about early April 2026, the defendant contacted an individual in the United States ("SOI-1") and asked if SOI-1 knew someone who could carry out attacks, and potentially kill individuals, in the United States. Dkt. 6 at ¶ 17. SOI-1 introduced the defendant to another individual ("UC-1") as someone who could carry out such attacks. *Id*. Unbeknownst to the defendant, UC-1, who was purporting to be a member of a Mexican drug cartel, was an undercover law enforcement officer acting at the direction of law enforcement. *Id*.; Dkt. 1 at ¶ 17(a). The defendant texted UC-1 photographs and maps showing the exact location of a prominent Jewish synagogue located in Manhattan (the "New York Synagogue"), as well as two additional U.S.-based Jewish institutions in California and Arizona, and directed UC-1 to carry out terrorist attacks against those targets. Dkt. 6 at ¶ 17; Dkt. 1 at ¶ 17(c). The defendant also spoke on the phone with UC-1, and discussed whether UC-1 would use an improvised explosive device or "set the place on fire," referring to the New York Synagogue. Dkt. 1 at ¶ 17(e). On or about April 4, 2026, the defendant paid UC-1 approximately $3,000 U.S. dollars in cryptocurrency, believing that UC-1 would conduct an attack on the New York Synagogue. *Id*. at ¶ 17(g).

On or about April 30, 2026, the day before the defendant was arrested in Turkey, the defendant again contacted SOI-1 to see if UC-1 could carry out a terrorist attack and kill or injure civilians in the United States. Dkt. 6 at ¶ 18. The defendant called SOI-1 and asked if UC-1 could "attack," including by "burning, . . . or whatever he can," including "killing." SOI-1 responded that SOI-1 would talk to UC-1 about such an attack later that day. *Id*. The next day, the defendant was detained in Turkey, putting an end to his spree of terrorist violence. *Id*.

**F. The Defendant's Post-Arrest Statements**

Approximately two weeks after being arrested in Turkey, the defendant was transferred to the custody of the FBI and transported to the United States. *See* Dkt. 6 at ¶ 19. While en route to the United States, the defendant waived his *Miranda* rights and voluntarily made statements to FBI agents. *Id*. at ¶ 20. Among other things, the defendant stated, in substance and in part, that: (i) he was a leader of "the resistance," which he explained encompasses the IRGC and its proxies, including Kata'ib Hizballah, Hizballah, and the Houthis, and that he was in charge of media and psychological warfare, including against the United States; (ii) he had a very close relationship with the leadership of the IRGC, including Soleimani and Ayatollah Khamenei; (iii) he had the ability to "raise or lower the level of attacks" in response to the Iranian Military Conflict; and (iv) he was responsible for handling media for Harakat and explained that the propaganda videos of

the European Terrorist Attacks were part of the "psychological warfare" that "the resistance" was waging against the United States, designed to instill fear and terror in civilians. *Id.*

**G. Additional Relevant Conduct**

The defendant has continued espousing his terrorist ideology since his arrival in the United States. For example, on or about May 15, 2026, after his first court appearance in this case, the defendant met with his attorney and an interpreter. During that time, the defendant participated in a FaceTime video call with a woman, who we understand to likely be his mother. On the call, the defendant stated, in substance and in part, "We shall not care whether we fall upon death or death falls upon us as long as we are on the path of truth. Imprisonment." Those words appear to have been carefully chosen, as they have been used by Shiite terrorist organizations in the context of discussing the need to wage violent jihad against the United States and Israel. Shortly thereafter, consistent with the defendant's use of the internet and social media to spread messages intended to incite terrorism, a recording of that video call was circulated online and posted to various accounts and media outlets commonly used to circulate content and propaganda by Shiite militant groups, including the IRGC and Kata'ib Hizballah. In fact, many of the Harakat propaganda videos of the European Terrorist Attacks were posted to these same media channels. Below is one example of a screenshot demonstrating the circulation of the video call on such a media channel, which appears to have more than one million subscribers. The defendant's video alone was viewed more than 90,600 times and generated more than 3,000 reactions and/or comments to the post:




The defendant has also been a prominent figure in the media, including since his arrest in this case, and his arrest has been extensively reported on in the media. For example, on or about May 16, 2026, the defendant's arrest was on the cover of the New York Post, with the headline, "Global Terror Spree: Iraqi man behind 20 attacks on Jews worldwide, including plot to bomb NYC synagogue," N.Y. Post (May 16, 2026); similarly, on or about May 22, 2026, the defendant was the subject of another cover-page article in the New York Post, titled Ivanka Trump targeted for assassination by IRGC terrorist in twisted plot to avenge president taking out his mentor, N.Y.

Post (May 22, 2026). Other national and international media outlets, including the New York Times, Wall Street Journal, NBC and CBS, have reported on the defendant's arrest and his ties to Iranian militia groups.[1] The defendant's notoriety, particularly given his role in disseminating propaganda and his professed understanding of how to engage in psychological manipulation, highlights the fact that he is in a position to incite others to engage in acts of terrorism against civilians.

## II. <u>The Defendant's Detention</u>

### A. Pre-SAMs Conditions

Since his arrest by U.S. authorities, the defendant has been detained at the Metropolitan Detention Center ("MDC"). According to BOP officials at the MDC, prior to the BOP imposing the SAMs on June 25, 2026, the defendant was held in administrative detention, which is designed to ensure the safety and security of MDC staff, visitors, and inmates.

Administrative detention involves non-punitive placement in the MDC's special housing unit ("SHU"). The defendant was housed in a single-person cell and participated in recreation without other inmates. The defendant was permitted to communicate by phone or in person with his legal team, including his attorneys and their staff. While the defendant's non-legal communications were limited pursuant to BOP policy, he was not precluded from talking to other inmates in his unit. The defendant also was permitted social calls during this time with members of his family.

According to MDC officials, no legal visits were prevented or impeded before the SAMs were imposed (or since, as discussed below).

### B. The Attorney General Authorizes the SAMs

The Attorney General may authorize the BOP "to implement special administrative measures that are reasonably necessary to protect persons against the risk of death or serious bodily injury." *See* 28 C.F.R. § 501.3(a). To do so, the Attorney General, or another authorized official, must notify the BOP in writing "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons." *Id.* SAMs may be imposed for a maximum of one year and may then be successively renewed, or re-imposed, in increments of up to one year. 28 C.F.R. § 501.3(c).

Here, following the defendant's arrest, the U.S. Attorney's Office, in coordination with the FBI and the Department of Justice's Counterterrorism Section of the National Security Division, submitted a memorandum to the Department of Justice's Office of Enforcement Operations ("OEO") recommending the imposition of SAMs based on many of the facts set forth above. OEO conducted its own review and recommended imposition of SAMs. The Acting Assistant Attorney

---

[1] *See, e.g.*, *Militia Commander Tied to Iran Plotted Attacks on Jewish Sites, Prosecutors Say*, N.Y. Times (May 15, 2026); *Iraqi Militia Leader Charged in Planned Attacks on Jewish Sites in U.S.*, Wall St. J. (May 15, 2026).

General and Deputy Attorney General, after reviewing information from OEO, submitted a memorandum to the Attorney General recommending imposition of SAMs.

On June 25, 2026, the Acting Attorney General submitted a memorandum to the BOP requesting that the SAMs be implemented in this case. A copy of that memorandum is attached as Exhibit A to the defendant's motion. In the memorandum, the Acting Attorney General concluded that "[b]ased upon the information provided to me of al-Saadi's violence, I find there is substantial risk that his communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons." Def. Ex. A at 2. SAMs were initiated the same day.

### C. Post-SAMs Conduct

Since June 2026, the defendant has participated in nine phone or video teleconference calls ("VTCs") with his immediate family.[2] As set forth below, the defendant's conduct on certain of those calls raises serious concerns that he is intentionally violating the SAMs, including by using his family to relay messages to third parties and directing those third parties to carry out certain "work" and to move money for the defendant's benefit. As described below, on recent calls, the defendant and his family have used coded language, and at times stated that they should be careful about using certain language to avoid the call being cut short. To date, it appears that the defendant has made little effort to communicate within the bounds of the SAMS, and has instead sought ways to communicate about prohibited topics without raising alarms. As a result, the FBI has been forced to cut short certain of those calls, based on its judgment that the calls concerned topics that likely violated the SAMs. Summaries of some of the defendant's calls are below.

<u>July 30, 2026 call</u>

On this call, the defendant asked his family about Hussein Moanes, a high-level member of Kata'ib Hizballah and U.S.-designated terrorist, and Qais al-Khazali, the founder of Asa'ib Ahl al-Haq, another U.S.-designated FTO. The defendant's sister mentioned the status of Iran-backed militias in Iraq having to disarm by September 30, 2026, and in response, the defendant asked about individuals whom he referred to as "Sajjad and Hashim" and whether they were able to do any "work," which appears to have been coded language. The defendant and his family also discussed an individual referred to as "Uncle Mohammad" and "the work," and the defendant instructed his family to tell Sajjad about "the work."

Later on the call, the defendant asked about "the guy with the $6 million," then stated that a particular individual—whom the FBI believes is an IRGC operative who was involved in sending information to the defendant relating to certain of the European Terrorist Attacks—knows his house location. The defendant directed his family to give the "work" to that individual. The defendant also brought up someone who owes him the U.S. dollar equivalent of nearly $1 million

[2] Despite the SAMs only requiring that the defendant be permitted a minimum of one phone call a month to his immediate family, the defendant has actually been given weekly or bi-weekly calls, including VTCs. Recordings and notes of each of those calls have been produced to the defense on a rolling basis as they are received by the Government.

in Iraqi dinar and asked if one of the Iran militia-aligned news outlets was posting about him. The defendant then directed his family to transfer Iraqi dinars totaling over $1 million USD to several unknown individuals.

August 13, 2026 call:

On this call, the defendant's family informed him that the situation in Iraq was worsening between the Iraqi government and the Shiite militia groups because the latter refused to give up their weapons. The defendant's family further informed him that they were approached by two Iraqi individuals and were instructed to do a "job" in Basra, Iraq in exchange for money—another reference that the FBI believes was likely coded language. According to the defendant's family, a third Iraqi individual had assigned the two others to approach the defendant's family and offer the money. In response, the defendant's sisters told the men that they would speak to the defendant and "Uncle Mohammad" about this. The defendant then told his sisters not to tell "Uncle Mohammad" about this transaction but gave his approval to carry out the "job." The defendant's mother then said to stop talking about this topic because "they may end the call." The call was then terminated by the FBI.

September 17, 2026 call:

On this call, the defendant's sister first warned the defendant that there are more parties listening to the call than there usually are. She then asked the defendant if he heard the news out of Yemen, and said they reached certain cities and shot down an F-15 fighter jet. She updated the defendant that the Baab al-Mandab strait is not fully closed like the Strait of Hormuz. The defendant then discussed the Houthis—a foreign terrorist organization operating in Yemen—and what support they were getting from other nations.

The defendant's mother mentioned certain individuals, and the defendant's sister said not to mention names on the call. The defendant asked about a specific individual, who the FBI believes was also involved in certain of the European Terrorist Attacks and supporting FTOs.

The defendant asked his family if they sent the rest of the money. The defendant's sister responded that they had, and that they posted it. The defendant's sister also mentioned the number of pages in issue number four and number five of a certain magazine, which the FBI believes was a coded reference to something.

The defendant mentioned individuals paying him for something related to the company, and the defendant's mother said they will pass the message along. The defendant's sister again reminded the defendant not to mention names of people when they talk about Iraq.

The defendant's mother said that a group within the Iraqi militia forces is talking about his case, and that "Saadiqun" was saying bad things about the defendant. The defendant's family said that a leader of the Badr Organization, a Shia political party and paramilitary organization, contacted the defendant's family to relay to the defendant that they are supporting his case.

The defendant's sister said that the defendant is appearing widely on TikTok, and the defendant said that he wants his pictures to be posted everywhere, and directed his family to go to Sayyid Abbas for help concerning media. The FBI then cut this call short.

<u>September 24, 2026 call:</u>

The defendant began this call by asking his family to publish his story through poetry and through the media, and to reach out to people to accomplish that. The defendant said that his family should pay money to people so they can write poetry. The defendant then told his family to bring cameras and take videos of everything.

The defendant asked how "Ali" is doing and his family said they transferred him to the international section and he's going to get a badge for the green section zone. The defendant's sister mentioned someone's brother brought a gun, and the defendant told his family to contact Ali. The defendant brought up "witnesses" and said "give him money so we can do it"

After the defendant's family's reference to someone that brought a gun, and the defendant telling his family to give money to people for something to be accomplished, the FBI cut this call short.

## III. <u>Discussion</u>

### A. The SAMs Fully Comply with 28 C.F.R. § 501.3 and Are Reasonably Necessary to Protect Against the Risk of Additional Terrorist Acts

The defendant argues that the SAMs do not comply with 28 C.F.R. § 501.3 because "they were imposed based on a purely speculative risk that Mr. Al-Saadi's communications with third parties would pose a risk to public safety." (Dkt. No. 14 at 8). That argument is meritless.

As an initial matter, courts have long recognized that SAMs are a lawful means of preventing detainees from carrying out or facilitating dangerous acts. *See United States v. Ali*, 396 F. Supp. 2d 703, 710 (E.D. Va. 2005) ("Terrorism matters present special security concerns because of the risk posed by the *possible exchange* of information by a defendant in such a case with someone outside of the detention center.") (emphasis added); *see also Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 16 (D.D.C. 2003); *United States v. Trabelsi*, No. 06 Cr. 89 (RWR), 2014 WL 12682266, at *4 (D.D.C. June 18, 2014) ("Prison regulations that are based on anticipatory concerns of prison security are rational, despite the absence of prior violence or disruptions."). Here, there is ample evidence to support the Acting Attorney General's conclusion that the SAMs are necessary in this case to avoid the "substantial risk" that the defendant's communications and contact with others could lead to death or serious bodily injury of persons or substantial damage to property that would entail the risk of serious bodily injury to persons. The evidence demonstrates conclusively that the defendant presents a serious risk to public safety including by harming others and inspiring future terrorist attacks akin to the nearly 20 attacks that he already planned and promoted in Europe and the United States. This includes evidence of the vast and global nature of Kata'ib Hizballah and the IRGC; the defendant's efforts to disseminate propaganda videos and materials of terrorist attacks that he planned and his continued, years-long

overtures on social media and other communications platforms inciting others to commit acts of violence against Americans, Jews, U.S. troops, and U.S. government officials; the defendant's international notoriety as a high-ranking member of Iranian-backed terrorist organizations; his ongoing desire to promote his terrorist ideology; and his proven ability to commit terrorist acts across numerous European countries, as well as to plan attacks in the United States. As set forth below, considering these concerns, the SAMs are justified for various, independent reasons. The SAMs also clearly have a "valid, rational connection" between the restrictions imposed on the defendant and the government's interest in preventing further violence from the defendant or his associates, and no ready alternatives to the SAMs could mitigate the risk posed by the defendant.

*First*, the defendant undoubtedly presents a physical threat to others. As described above, he personally coordinated and/or promoted numerous terrorist attacks, including bombings, arsons, and a near-fatal stabbing. He additionally planned other terrorist attacks, including a plot to attack a synagogue in New York City with an individual whom he believed to be a Mexican cartel member. There is no question that the defendant intended these attacks to result in death or serious bodily injury. Indeed, as recently as on or about April 30, 2026, the day before he was detained abroad, the defendant attempted to continue finding someone to carry out a terrorist attack and kill or injure individuals in the United States. As reflected in his communications with SOI-1, the defendant wanted to find someone who could "attack," including by "killing" and "burning, . . . or whatever he can." Just the day before that, on or about April 29, 2026—the day two men were stabbed in London in an attack for which Harakat claimed responsibility—the defendant instructed the Kata'ib Hizballah Musa Contact to "post it in the news[,] important," referring to video footage of that attack, including a propaganda video that Harakat posted on Telegram in which it claimed responsibility for that attack. That same day, the defendant also sent the following message to the Kata'ib Hizballah Musa Contact: "If God grants us success tonight, there will be a shooting at a restaurant." These attempted acts of murder came on the heels of the defendant's personal involvement in coordinating arsons and bombings of places of worship, public buildings, restaurants, and other civilian infrastructure over a period of nearly two months. Without question, these facts demonstrate the profound danger he presents to others.

Equally concerning is the defendant's belief that he was justified in his indiscriminate acts of violence against innocent civilians as part of his distorted view that such actions were justified as part of the ongoing military conflict with Iran. The defendant has expressed no remorse. Rather, he appears to view his terrorist actions as a legitimate combat objective. In his post-arrest interview, the defendant explained that the propaganda videos of the European Terrorist Attacks were part of the "psychological warfare" that "the resistance" was waging against the United States, designed to instill fear and terror in civilians. And even weeks after being arrested for his terrorist actions, he continued in his assertions that his actions were justified. (*See, e.g.*, June 1, 2026 Arraignment Transcript at 5, "I'm not guilty and in a war situation . . . I'm a prisoner of war. I'm not a threat. Our children and women are being killed by your rockets."). The Government cannot take the substantial risk that other inmates, prison staff, visitors, or the public at large will become further victims of the defendant's twisted desire to promote violent attacks against civilians in furtherance of terrorist groups aligned with Iran. The Acting Attorney General was undoubtedly justified in concluding that the defendant's contacts with others presents a substantial risk to the safety of others.

*Second*, the defendant's unfettered communications with third parties would pose a threat to the public. By the defendant's own admission, he identifies himself a leader of "the resistance"—which includes the IRGC and its proxies, including Kata'ib Hizballah, Hizballah, and the Houthis—who, among other things, is in charge of its media and psychological warfare, including against the United States, as well as strategy and military intelligence. As part of waging psychological warfare, he coordinated and disseminated videos of the European Terrorist Attacks to advance the war aims of the IRGC and Kata'ib Hizballah, and to inspire other violent terrorist actors to take similar actions. His social media accounts are replete with calls to violence, including the activation of terrorist cells across the globe to attack Jews and Americans. In just one example, in or about February 2026, Al-Saadi posted on one of his social media accounts a message in Arabic, which read in part, "Do not abandon the blood of your Imam of the time, oh Shiites of Iraq. Kill everyone who supports America and Israel. Do not leave any of them remaining. Civil and military targets, as well as voices of discord, kill them everywhere." That same day, the defendant also posted on his X account a call to arms to attack Americans and Jews. The message, which was posted in Arabic, stated, among other things: "every individual or group capable of killing an American or Zionist target, whether civilian or military, in any country of the world, should begin by targeting them."

The defendant's external communications are a distressing and dangerous source of propaganda including violent calls to radical militants to engage in horrific acts of violence against innocent civilians. The defendant's assertion in the Motion that the SAMs are invalid because they were imposed on a speculative risk that al-Saadi's communications with third parties would pose a risk to public safety flies in the face of the facts of this case and common sense. Significantly, in March and April 2026, the defendant and his associates were able to carry out 18 terrorist attacks across Europe, and the defendant was actively involved in planning additional attacks in the United States. Since the defendant's arrest, he has had limited ability to communicate with third parties. It is not a coincidence that since his incapacitation on or about May 1, 2026, there appear to have been no additional attacks in Europe or attempted attacks elsewhere attributable to Harakat. Even before SAMs were formally imposed in this case, the BOP imposed restrictions on his third-party communications to prevent his ability to communicate with others regarding violence and his terrorist ideology. In other words, the defendant was prevented, since the start of his incarceration, from having the ability to pose a risk to the lives and safety of others while in BOP custody. And in the instances in which he has been permitted social calls, both before and after the implementation of the SAMs, he has used those communications to send messages and to direct third parties to engage in actions that, in context, are very concerning.

The risk that the defendant, if given the opportunity, will communicate with others regarding his violent ideology and seek to inspire others is further borne out by his post-arrest statements proudly taking responsibility for numerous attacks in conjunction with FTOs, his conduct in Court in which he persists in claiming his terrorist actions were justified, and his phone calls with relatives in which he appears to direct them to communicate with known terrorists in Iraq about transferring money for continued "work." Just as the defendant was inspired to commit his attacks in coordination with the IRGC and Kata'ib Hizballah, so too could others be inspired by the defendant's plight and receptive to his directions and the propaganda that he could disseminate from prison, if given the chance to do so. Indeed, it appears from the defendant's social calls that he is attempting to do just that: direct others to take action on his behalf and spread

the word of his incarceration to rally around him and his cause, for example, on his last call on September 24, 2026, when he directed his family to "give him money so we can do it."

*Third*, the Government's concerns regarding the defendant's ability to communicate dangerous information from prison are also well-founded. Past experience has amply demonstrated that BOP detainees—even those who receive the expected extra scrutiny afforded someone charged with a crime of terrorism—retain the ability to engage in dangerous conduct while in custody. For example, the public record of the trial of the World Trade Center bombing revealed that defendant Ahmad Ajaj, while incarcerated in the now-closed Metropolitan Correction Center, made coded telephone calls in Arabic seeking to aid the persons involved in the World Trade Center bombing plot, then in the planning stage. *United States v. Salameh*, 152 F.3d 88, 108 (2d Cir. 1998). Although the calls were subject to monitoring and recording, it was not possible to decipher the true import of these conversations until much later. The World Trade Center was bombed, six people were killed, and more than a thousand were injured. A jury later found Ajaj culpable for the attack, notwithstanding his imprisonment for most of the six months preceding the bombing. *Id.* Similarly, evidence at the trial of *United States v. Rahman*, 93 Cr. 181 (MBM), showed that El Sayyid Nosair, during his imprisonment in a high-security segregated housing unit at Attica, used "social visits" to help facilitate the bombing of the World Trade Center and otherwise plotted a campaign of terror directed against New York City landmarks, Jewish leaders in the New York area, and the judge who presided over his state homicide trial. This is precisely the type of conduct that the FBI has tried to guard against in cutting certain of his SAMs calls short, particularly where the defendant and others appear to be using coded language. Vacating the SAMs on his external communications would take away any workable ability for them to continue doing so.

To reinforce why SAMs are particularly appropriate in this case, it is important to emphasize that a defendant need not have a demonstrated history of communicating with others about terrorist activities in order for SAMs to be imposed. *See United States v. Tsarnaev*, No. 13 Cr. 10200 (GAO) (D. Mass. 2013) (defendant ultimately convicted of Boston Marathon bombing was subject to pretrial SAMs where there was no evidence that he had direct contacts with a terrorist organization). But in this case, the defendant has a long and documented history of communicating with others about terrorist attacks. As he admitted, he was responsible for "media" and promotion of the European Terrorist Attacks and actively encouraged others to commit terrorist actions through a variety of mediums, including social media, cellphone communications, encrypted messaging applications, and militia-aligned media platforms.

In sum, the evidence justifying the imposition of SAMs is concrete and overwhelming. The defendant's involvement in violent attacks against civilians and civilian infrastructure, his years-long public communications encouraging others to commit terrorist acts, and his continued commitment to terrorist ideology demonstrate unequivocally that there is a substantial risk that his communication and contact with others could result in grave harm to the public. The SAMs are thus reasonably necessary to protect against that risk and the defendant's motion to vacate the SAMs should be denied.[3]

---

[3] Because the SAMs were imposed in accordance with 28 C.F.R. § 501.3, they are likewise constitutional. *See* Motion at 9 ("SAMs only pass constitutional muster if the Court finds they

**B. The Defendant's Proposed Modifications to the Language of the SAMs**

In the alternative to vacating the SAMs, the defendant seeks modifications to the language of certain SAM provisions. As an initial matter, none of these proposed modifications relate to the grounds on which the defendant has moved to vacate the SAMs, nor does he claim that any of these provisions as currently written have in fact curtailed his ability to prepare a legal defense. Nevertheless, the Government responds to those proposed modifications, as outlined below:

- **Paragraph 2.h.** The Government objects to the proposed modifications to Paragraph 2.h. The "including" language provides illustrative examples, and as already written, does not purport to encompass all types of documents that the defendant may review with his counsel that are relevant to his defense.

- **Paragraph 2.h.i.** The Government objects to the defendant's proposed modifications of this paragraph. However, to address the issue raised in the Motion, and for the avoidance of doubt, the Government consents to the inclusion of this additional sentence at the end of this paragraph: "Nothing in this paragraph limits the defendant's ability to review with his counsel discovery materials produced by the Government, in accordance with the designations that such materials are marked pursuant to the Protective Order in this case."

- **Paragraph 2.h.ii.** The Government consents to the defendant's proposed additional sentence, with the exception that the Government does not agree with the inclusion of the language ". . . including, if appropriate, on an *ex parte*, basis." If, after conferring with the defense, the Government does not approve of the defendant's request in the first instance, and the defendant then seeks leave of the Court, the Government should be permitted an opportunity to provide its position to the Court regarding why it believes those specific documents should not be permitted to be presented to the defendant under the SAMs.

  **Paragraph 3.b.i.** The Government believes that this SAM, as written, already appropriately protects against the possibility of the defendant's family members permitting others to overhear and/or record their telephone calls, and no modification should be made. To the extent the defense is concerned about unknown third parties surreptitiously listening to the calls, without the knowledge or consent of any of the parties to the call, it is difficult to conceive of how such a scenario would result in a SAMs violation for any of the parties to the call. The defendant's proposed language is therefore unnecessary.

- **Paragraph 3.e.** The Motion erroneously claims that the "government [] used the SAMs in this case to terminate a family phone call on July 13, 2026, after Mr. Al-Saadi asked his family to raise awareness about his plight in Iraq and Iran, to encourage leadership in those

---

address the legitimate penological and public safety concerns 28 C.F.R. § 501.3 was designed to address."). As described above, the SAMs are in place to address specific and justifiable national security concerns and are not, as the defendant suggests, intended to be punitive.

countries to demand his release." In reality, to the extent the FBI terminated any call, it did so out of a genuine concern that the defendant was using the calls to violate the SAMs, specifically by enlisting third parties to engage in certain conduct, including possibly additional criminal acts, including planning or even carrying out more attacks such as the European Terrorist Attacks. As described above, on several calls, the defendant has inquired of his family regarding their communications with known terrorists on his behalf, discussed transferring large sums of money to unknown individuals in Iraq, and discussed calling on others to do unspecified "work," which the FBI reasonably believes could refer to additional terrorist acts. The addition of the proposed SAMs language will create enormous strain on the FBI to try to further decipher the defendant's intentions when giving these instructions to his family members. Moreover, the proposed addition remarkably and erroneously assumes that advocacy about the defendant's "unlawful . . . capture and detention in the United States," should be permitted, where there is nothing remotely unlawful about it. To the contrary, the defendant is a terrorist who attempted to kill Jews and Americans around the world, including in the United States. His violent plots were interrupted only after he was detained and prevented from directing others in the way the SAMs now seek to prevent. The "advocacy" for which this proposed modification is intended to advance would directly permit propaganda and misinformation feeding the defendant's terrorist goals to incite others to commit violence in his name. The Government, therefore, objects to this proposed modification.

In addition, while not a challenge to the SAMs, the Motion requests other "accommodations" for the defendant while in BOP custody, including:

(i) provision of a television with Arabic language programming;
(ii) bi-weekly phone calls with Al-Saadi's relatives; and
(iii) permission for Al-Saadi to purchase more food from the commissary.

With respect to the first request, the BOP opposes the request to provide the defendant with a television with Arabic language programming. The BOP houses defendants from many different countries who speak a variety of different languages. It is not tenable or appropriate for the BOP to assume the responsibility of providing special language television programming for the defendant, or for any other defendant. The defendant is already authorized, under the existing SAMs, to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures. (Def. Ex. B at 18).[4]

With respect to the second request, the BOP has already provided the defendant with social calls on a near-weekly basis throughout the term of his incarceration at MDC, despite the fact that the SAMs only require that the defendant be permitted a minimum of one social call per month. In view of the frequency that the defendant has been permitted family calls under the existing SAMs, and his demonstrated inability to comply with the SAMs while on the calls he is already permitted, the Government objects to any further modifications respecting the frequency of calls.

---

[4] On September 15, 2026, the Court entered an order pertaining to the defendant's access to non-legal reading materials (Dkt. No. 14), and therefore, the Government does not address that aspect of the Motion again here.

Moreover, the SAMs do not limit the defendant's ability to have unlimited legal calls or visits, thereby undercutting any claim by the defendant that the SAMs infringe on his Sixth Amendment right to counsel.

With respect to the third request, as the Government stated in its letter dated September 8, 2026, based on conversations with the BOP, the Government understands that the defendant has been receiving certified Halal and Kosher meals, and that those meals are the same as those provided to other inmates at the MDC with similar religious dietary restrictions. The defendant is also entitled to purchase additional food items from the commissary, just like any other inmate at the MDC, and has already been permitted special accommodations to purchase commissary in excess of those available to other inmates. The defendant is already being provided portions comparable to all other inmates housed in BOP custody, with special accommodations for his religious and dietary restrictions. The Government therefore sees no need for the intervention of the Court to make special accommodations for the defendant in this respect.

**C. The Defendant is not a Prisoner of War under the Third Geneva Convention**

Finally, the Court should reject the defendant's claims that the SAMs violate any protection he has as a purported "prisoner of war." (Dkt. 14 at 6-8). He has no such protection because he is not a prisoner of war.

At the September 9, 2026 pretrial conference, defense counsel indicated that they intend to file a formal motion to dismiss the Indictment on the grounds that the defendant is entitled to immunity from prosecution as a lawful enemy combatant. *See* Sept. 9, 2026 Tr. at 22. The defendant has yet to make that motion. While the Government will respond in full to any future motions the defendant chooses to raise, the Court can and should determine, based solely on the allegations in the Indictment and without need for any further factfinding, that the defendant is not a lawful enemy combatant, is afforded none of the protections pertaining thereto, and his SAMs should not be vacated on that basis.

"Combatant immunity is rooted in customary international law and 'forbids prosecution of soldiers for their lawful belligerent acts committed during the course of armed conflicts **against legitimate military targets**.'" *United States v. Hamidullin*, 888 F.3d 62, 66 (4th Cir. 2018) (citing *United States v. Lindh*, 212 F. Supp. 2d 541, 553 (E.D. Va. 2002)) (emphasis added). The current doctrine of combatant immunity is codified in the Third Geneva Convention (the "GPW"), drafted in the wake of World War II. Where there exists an international armed conflict, as set forth in Article 2 of the GPW, lawful combatants who are captured in such a conflict are considered prisoners of war and entitled to certain protections, including immunity from criminal prosecution in a civilian court. *See id.*[5] The categories of combatants qualifying as "lawful" are listed in

[5] Where there exists a non-international armed conflict, as set forth in Article 3 of the Convention, a defendant cannot claim immunity from prosecution in a civilian court. *See, e.g.*, *United States v. Najibullah*, 14 Cr. 401 (KPF), Dkt. 141 (S.D.N.Y. Nov. 1, 2024) (holding that a Taliban commander charged with providing material support for acts of terrorism and murder of U.S. servicemembers in Afghanistan could not claim combatant immunity because the conflict in Afghanistan was a non-international armed conflict under Article 3); *Hamidullin*, 888 F.3d at 70

Article 4 of the GPW, which states, in relevant part, that the captured individual must be part of an organization whose members "conduct their operations in accordance with the laws and customs of war." GPW Art. 4(A)(2)(d).

Notably, the Government is unaware of, and the defense has not cited, a single case in which a court has afforded combatant immunity to a defendant who, as here, is charged with carrying out and supporting terrorist attacks against civilians in support of designated FTOs. That is unsurprising, since terrorist attacks targeting civilians are clear violations of the laws and customs of war. For example, Article 51 of the Additional Protocol I to the Geneva Conventions, which protects civilians against the dangers of military operations during international armed conflicts, states that civilians "shall not be the object of attack," and that "[a]cts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited."[6] Indeed, courts around the country have regularly found that members of terrorist organizations and belligerent groups who target civilians are not entitled to combatant immunity. *See, e.g.*, *United States v. Hamidullin*, 114 F. Supp. 3d 365, 387 (E.D.V.A. 2015) (holding that the members of the Taliban and Haqqani Network were not entitled to combatant immunity because they, among other things, targeted civilians and did not "conduct[] their operations in accordance with the laws and customs of war"); *United States v. Hodzic*, 2018 WL 7916323, at *10-11 (E.D. Mo. May 9, 2018) ("[I]t is legally impossible under United States' interpretation of international law for members of organizations found by the American Executive to be FTOs to be granted combatant immunity."); *United States v. Hausa,* No. 12 Cr. 134 (BMC), 2017 WL 2788574, at *6 & n.6 (E.D.N.Y. June 27, 2017) (noting that an al Qaeda operative was not entitled to combatant immunity because, among other disqualifying factors, al Qaeda "disregards the laws and customs of war"); *Lindh*, 212 F. Supp. 2d at 558 (denying combatant immunity claim "because record evidence supports the conclusion that the Taliban regularly targeted civilian populations in clear contravention of the laws and customs of war").

Thus, even assuming that the defendant met all of the other requirements under Article 4 of the GPW, which he does not, the conduct with which the defendant has been charged disqualifies him from advancing any credible combatant immunity claim. As the defendant stated in his post-arrest interview, spreading fear among civilians was his goal behind the European Terrorist Attacks. The allegations in the Indictment also make plain that, in targeting American and Jewish civilians in the European Terrorist Attacks, and in his plot to attack a synagogue in Manhattan by paying a purported cartel member to carry out the attack, the defendant was not engaged in legitimate military operations—he was carrying out and supporting terrorist attacks against civilians in cities across the world on behalf of designated FTOs. The charged conduct in this case thus precludes the defendant from claiming combatant immunity.

---

("[B]ecause we conclude that the conflict in Afghanistan was non-international at the time of Hamidullin's offense, the protections of Article 3 of the Convention apply. Under Article 3, however, there is no provision entitling combatants captured during non-international conflicts to POW status or the resulting combatant immunity.").

[6] *See* https://ihl-databases.icrc.org/en/ihl-treaties/api-1977/article-51.

Finally, the Court should reject the defendant's argument that he should be presumptively treated as a prisoner of war under Article 5 of the GPW while his combatant claim is litigated. (Dkt. 14 at 7-8). As described above, the defendant cannot credibly advance the affirmative defense of combatant immunity in this case. Nor has the defendant carried his burden to show that there is doubt as to his combatant status that would warrant the applicability of Article 5. As with any affirmative defense, it is the defendant who bears the burden of establishing that he is entitled to combatant immunity.[7] For the defendant to even attempt to advance such a defense, he will need to concede that he was, in fact, a member of or acting on behalf of Kata'ib Hizballah and/or the IRGC and then attempt to establish *both* (i) that there existed an international armed conflict with those organizations under Article 2 of the GPW, and (ii) that those organizations fall within the types of organizations prescribed in Article 4 of the GPW. He has not done so, nor can he. Accordingly, the Government respectfully submits that there is no doubt about the defendant's combatant status sufficient to trigger Article 5's presumption of combatant status.

Accordingly, the Court should reject the defendant's argument that the SAMs should be vacated because they violate protections he claims to be entitled to under the Geneva Conventions.

* * *

For the reasons set forth above, the Government respectfully submits that the defendant's motion to vacate or modify the SAMs, except in the limited ways agreed to above, should be denied.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________
Jeffrey W. Coyle
Sarah L. Kushner
David J. Robles
Assistant United States Attorneys
Southern District of New York
(212) 637-2437/2676/2550

---

[7] *See, e.g.*, *United States v. Harcevic*, 999 F.3d 1172, 1179 (8th Cir. 2021) (citing cases and holding that "[l]ike other courts, we agree with the government that Harcevic's assertion that Pazara was entitled to lawful combatant immunity is an affirmative defense"); *Lindh*, 212 F. Supp. 2d at 557 (holding that, "it is Lindh who bears the burden of establishing the affirmative defense that he is entitled to lawful combatant immunity").