Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

October 13, 2026

***By CM/ECF***
The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Mohammad Al-Saadi***
**26 Cr. 220 (CM)**

Dear Judge McMahon:

The defense respectfully submits this letter in further support of his motion to vacate or modify the Special Administrative Measures (SAMs) and to improve his conditions of confinement ("Mot.," Dkt. 14). The government's opposition overlooks the controlling legal framework and applicable precedents. It does not address the heightened standards that apply to detainees like Mr. Al-Saadi who have not been tried or convicted. *E.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Nor does the government address *United States v. Felipe*, where the Second Circuit applied the Supreme Court's *Turner* test to identify four factors to consider when assessing SAMs. 148 F.3d 101, 111 (2d Cir. 1998) (discussing *Turner v. Safley*, 482 U.S. 78, 87 (1987)) (discussed at Mot. 10). Its opposition assesses only the first of those four factors—a supposedly "rational connection" between the government interest and the SAMs it has imposed. But even there, its analysis falters.

Applying the proper legal framework, Mr. Al-Saadi's punishing SAMs restrictions do not pass constitutional scrutiny. The Court should vacate them or, in the alternative, provide remedial measures including (1) amending them consistent with Exhibit B to the defense's Motion so that counsel operates with clarity about the restrictions and (2) permitting Mr. Al-Saadi access to less restricted and more frequent family calls, and Arabic-language media. The defense also requests a hearing on the Motion.

## I. Background

The background, while familiar to the Court, bears briefly summarizing because the government does not fully contend with it. Since Mr. Al-Saadi was illegally captured and detained in an embassy basement before being brought to this country over five months ago, he has lived in extraordinary isolation. He generally is not allowed to speak with

anyone. He is permitted to video call his family for approximately two hours each month – calls that are often cut short. And he can see his counsel, whenever busy lawyers have time to go to MDC to visit him. The rest of the time he sits alone on the floor of his cell, isolated and often without reading material. He is provided an English-language radio, but he does not speak English. The government's justifications for these draconian restrictions do not withstand scrutiny.

## II. The government cannot establish lawful bases to impose SAMs.

### A. There is no rational relational relationship between the SAMs and a legitimate government interest.

The government's "rational connection" argument relies on elliptical summaries of Mr. Al-Saadi's calls with his family and generalizations about Muslim and Arab individuals charged with terrorism. Neither is persuasive.

#### 1. Insinuations about Arab and Muslim men do not justify imposing SAMs.

Beginning with the latter, the Court should not accept the government's invitation to violate Mr. Al-Saadi's due process and equal protection rights by allowing the executive to impose solitary and other punishing conditions of confinement on him because of what some other Arab and Muslim men in custody did over thirty years ago. The government discusses, among other examples, El Sayyid Nosair, who was convicted of murder in aid of racketeering in 1994, one Mr. Al-Saadi was a baby. Opp. at 15. The government would have this Court base its ruling—in Mr. Al-Saadi's case in 2026—on something it contends that Nosair did in state prison in the early 1990s. *See* Opp. at 15. There is no relationship between these two men. Messrs. Nosair and Al-Saadi have never met. They never worked together. Nosair was allegedly part of the Sunni Muslim Brotherhood and Mr. Al-Saadi is allegedly part of Shi'ite Kata'ib Hizballah. Nosair is Egyptian and Mr. Al-Saadi is an Iraqi who was born in Iran. The only commonality between these two men is that they are both Arab and Muslim. The Court should not and must not base its ruling on generalizations about housing Arab and Muslim men who face different charges decades apart from each other. *Cf. Buck v. Davis*, 580 U.S. 100, 119 (2017) ("patently unconstitutional" for state to rely on race when imposing punishment); *Zant v. Stephens*, 462 U.S. 862, 885 (1983) (race "totally irrelevant" to sentencing process); *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (prosecution may not be based on "arbitrary classification"); *United States v. Leung*, 40 F.3d 577, 586 (2d Cir. 1994) (race and nationality must not be considered at sentencing).

For the same reasons, there is no legitimate basis for the government to invite the Court to rely on *United States v. Tsarnaev*, Opp. at 15, a case involving a young man whose family was from Dagestan, who lived in the United States, and who was convicted of killing and maiming people by planting bombs. Mr. Al-Saadi is not alleged to have killed or seriously injured anyone; he is not charged with murder; and he never would

have come to this country if he had not been brought here involuntarily. The only commonality between Mr. Al-Saadi and Tsarnaev is that both men are Muslim, which is not a legally relevant factor. *See Buck*, 580 U.S. at 119; *Armstrong*, 517 U.S. at 564.[1]

**2. Mr. Al-Saadi's family calls do not justify imposing SAMs.**

The government fares no better with its discussion of Mr. Al-Saadi's family calls, which relies on speculation and unsupported inference. As a preliminary matter, the government publicly filed its partial descriptions of Mr. Al-Saadi's family calls even though they are subject to the SAMs. Opp. at 10-12. According to the SAMs, had defense counsel done that, we would have risked criminal sanction. The government's public filing of its summaries of these communications belies its argument that they are inherently dangerous. Rather, it reveals that the restrictions that the government has imposed on Mr. Al-Saadi are not commensurate with any dangers that these communications allegedly pose.

The government's summaries do not justify imposing SAMs. Its description of the September 17, 2026, call is particularly telling. *See* Opp. at 11. It states that Mr. Al-Saadi's family updated him on the contents of television news reports about the ongoing war in their part of the world—on that day featuring activities in Yemen and the Strait of Hormuz. That entailed discussing a Yemeni group, the Houthis. The government has never described Mr. Al-Saadi as either Yemeni or as a Houthi. Its suggestion that this conversation was improper is effectively an argument that a pretrial detainee should not be permitted to know the contents of television news programming. The government then insinuates that Mr. Al-Saadi's discussion of family finances pertains to money for terrorist activities; but that is simply speculation.

Notably, the government provides no declaration from anyone at the FBI stating that, based on their expertise, experience, or familiarity with this case, Mr. Al-Saadi, his mother, or his two sisters used coded language. It provides only the government's lawyers' speculation about conversations that were translated from Arabic. This is not a basis upon which to keep someone in extreme isolation. The government describes these portions of the conversations in its opposition as though they were clearly improper, but notably the FBI did not cut the call short during these exchanges.

It instead "cut this call short" when Mr. Al-Saadi's sister told him that he is "appearing widely on TikTok, and the defendant said that he wants his pictures to be posted everywhere, and directed his family to go to Sayyid Abbas for help concerning media." Opp. at 12. But as discussed on page 11 of the motion—and uncontested by the

[1] The defense is especially sensitive to any suggestion that Mr. Al-Saadi is somehow more deserving of SAMs for anything to do with his religion or national origin given President Trump's intemperate and inflammatory language mocking Islam and framing the war with Iran in religious terms. Indeed, on April 5, 2026, Roman Catholic Easter, President Trump posted a vulgar message on social media, warning Iran to reopen the Strait of Hormuz and writing: "Open the Fuckin' Strait, you crazy bastards, or you'll be living in Hell – JUST WATCH!" followed by "Praise be to Allah."

government—a defendant has a First Amendment right to engage in advocacy about his case. *United States v. Sattar*, 395 F. Supp. 2d 79, 102-03 (S.D.N.Y. 2005) (discussing *Brandenburg v. Ohio*, 395 U.S. 444 (1969)). By acknowledging that it cut a family call "short" to stop such a discussion, the government effectively concedes that it violated Mr. Al-Saadi's rights under the First Amendment.

The government's description of the September 24, 2026, call is also telling and casts some doubt on its linguists' translations. There, the government claims that the FBI cut short the call because Mr. Al-Saadi made references to an unknown "Ali" and a nebulous statement about a gun. But the truth is far more banal, which the defense contends is evident from the call itself. The "Ali" referenced in the call is Mr. Al-Saadi's brother-in-law. In the call, Mr. Al-Saadi was simply inquiring about his sister's husband, who has a new job. The comment about a "gun" was a joke that Ali made recently. It referred to Ali's gentle ribbing of Mr. Al-Saadi's sister that the family put a gun to his head to force him into marriage. Certainly, the government cannot interpret or implement the SAMs to prevent Mr. Al-Saadi from learning about his sisters' lives or from joking with them about internal family dynamics.

Indeed, although the government urges the Court to determine that it has afforded Mr. Al-Saadi adequate access to his family, he has only had two calls to date that were not cut short arbitrarily by the government.

**3. The government cannot show that Mr. Al-Saadi is a threat to prison staff or other inmates.**

The government cannot support its position that Mr. Al-Saadi would pose a threat to other inmates, or to anyone, if housed with President Maduro in general population. The government argues that Mr. Al-Saadi is a threat because of his "social media" presence. Opp. at 12-13. But no MDC inmate has access to social media. It opines, rhetorically, that Mr. Al-Saadi "undoubtedly presents a physical threat to others." Opp. at 13. But this is not a man alleged to have ever physically harmed someone in his presence. The government's argument is based on the allegation that Mr. Al-Saadi encouraged or organized incidents before he was arrested. But if that were the standard for imposing SAMs, much of the MDC would be under these kinds of SAMs. BOP has long recognized that less extreme measures suffice to protect the public and prison staff from pretrial detainees – including rigorously vetting their visitor list and recording and monitoring their calls and written correspondence.

The government argues that SAMs are appropriate because Mr. Al-Saadi allegedly believes "he was justified in his indiscriminate acts" and has a "distorted view that such actions were justified as part of the ongoing military conflict with Iran." Opp. at 13. That is nothing more than arguing that he should have SAMs imposed because he has stated that he will move for combatant immunity. The government is not permitted to punish a pretrial detainee for filing motions to assert his rights. *Cf. Blackledge v. Perry*, 417 U.S. 21, 28 (1974) (state may not add charges to punish defendant for pursuing appeal); *United*

*States v. Jackson*, 390 U.S. 570, 581 (1968) ("If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional.").

***

In short, the government has not provided specific bases upon which to find that there is a nexus between its interest and the SAMs. Its generalizations based on "terrorism" offenses – citing examples of Arab and Muslim men charged with array of different offenses than those charged here – are unpersuasive.

## III. In the alternative, the Court should amend the SAMs as proposed in Exhibit B to Mr. Al-Saadi's Motion.

Should the Court decline to vacate the SAMs, it should order the revisions proposed in the redline attached as Exhibit B to Mr. Al-Saadi's motion. The government's arguments to the contrary, Opp. at 15, are unpersuasive.

- **Paragraph 2.h.** The government opposes using the word "including" in paragraph 2.h of the SAMs – essentially because it believes it is unnecessary. But defense counsel labors under an intolerable risk unless there is complete clarity. This revision should be ordered for the reasons described in our Motion. Mot. at 12.

- **Paragraph 2.h.i.** The government acknowledges half the problem, but its proposed revision leaves the other half in place. The problem is not only that the SAMs, as written, could be understood as prohibiting counsel from sharing Rule 16 discovery materials with Mr. Al-Saadi. The government acknowledges the need to fix that drafting error in its SAMs. But that leaves the other half of the problem – that counsel must be permitted to share any documents that it independently assesses are relevant to working on the defense. As one example, the defense may seek to offer trial or hearing exhibits that do not come from the government's discovery materials, and the defense's proposed revisions to this paragraph make clear that counsel may exercise its own independent judgment about what to share with our client if needed to work on his defense.

- **Paragraph 2.h.ii.** The government consents to the bulk of the requested change. But it seeks to bar defense counsel from making an *ex parte* application without first conferring with the government. That effectively bars any *ex parte* application. The Court should have discretion, upon receiving an *ex parte* application – from either party – to determine whether it may properly be decided without notice. That is particularly true here where such applications may include requests to share work product-related materials with Mr. Al-Saadi.

- **Paragraphs 3.b.i and 3.e**. The defense relies on its original submission concerning our requested modifications to these paragraphs.

## IV. Other Remedial Measures

In addition to vacating or modifying the SAMs, we request that the Court order other remedial relief designed to mitigate and/or alleviate the burden of his total solitary confinement. Since the status conference on September 9, 2026, Mr. Al-Saadi continues to suffer numerous indignities and punitive confinement conditions, all related to his presence on the SAMs unit. In particular, the defense avers that:

- For 14 days after the September 9 status conference, air ventilation was cut off in Mr. Al-Saadi's cell, causing extreme discomfort and agitation of his asthma.

- Mr. Al-Saadi receives clothing that is either too large or too tight, and is dirty, which directly interferes with his ability to pray in accordance with his religious beliefs. He also does not receive replacement clothing on time, leaving him with soiled clothing for days at a time.

- The Court has previously ordered that Mr. Al-Saadi receive non-legal reading materials within 48 business hours of the FBI's approval of the materials pursuant to the SAMs. However, since the conference on September 9, Mr. Al-Saadi has received only three of the many books and PDFs his counsel sends him through the mail weekly. The defense has repeatedly sought explanation from the government about the timing of the FBI's approval of reading materials to no avail.

- Mr. Al-Saadi regularly receives inadequate or incomplete portions of meals from MDC Brooklyn, causing him to experience substantial hunger pains. The defense believes Mr. Al-Saadi is supposed to receive 14 meals per week, but that two meals are regularly withheld. Sometimes, a single meal is divided over three days, such that Mr. Al-Saadi receives the fish one day, peanut butter and bread the next day, and a piece of cake the third day, when all the items were meant to comprise a single meal. When Mr. Al-Saadi recently threatened to go on hunger strike, the meals were suddenly restored, and he was given more food for three days before the quantity deteriorated once again. None of the non-fish items on the commissary list appear to be kosher or halal, which Mr. Al-Saadi requires.

- Mr. Al-Saadi is subjected to a 24/7 white noise machine that makes it very difficult for him to focus while praying or reading, and it otherwise interferes with his ability to fall and stay sleep. The noise is so loud that it causes him to

experience intense headaches, and he must scream to get the attention of correctional officers.[2]

- Given the language barrier and the lack of a dedicated Arabic speaker on the SAMs unit, Mr. Al-Saadi cannot convey basic requests to correctional staff or have basic needs addressed in a timely manner.

- Mr. Al-Saadi often receives his commissary order form late, which causes delays in delivery of food items necessary to supplement what he receives from MDC Brooklyn. Either the items Mr. Al-Saadi orders never arrive or his orders are incomplete.

- Although other detainees in the SAMs unit can watch television from a dedicated cage, Mr. Al-Saadi has only been given access to that cage three or four times in the past five months, and the television does not contain any Arabic-language programming.

- Mr. Al-Saadi's cell has no furniture or place for him to sit, except for his steel bedframe, so he must sit on the floor to read.

- Mr. Al-Saadi is only given one towel with which to clean his room and dry himself after showering. The walls in the shower are also made of steel and the steam condenses quickly, which makes him sweat immediately after taking a shower and interferes with his ablutions in advance of daily prayer.

- Mr. Al-Saadi also does not have a pillow, only a thin mattress and a bedsheet. During the night, and throughout the day, correctional officers "check in" on his cell, sometimes slamming shut the window to his cell door, waking him up.

- Mr. Al-Saadi has no access to the outside through a window to his cell and cannot tell the difference between day and night, which is psychologically discombobulating and disturbing. The defense can discern no legitimate reason why Mr. Al-Saadi should be deprived of natural light.

Of course, the defense understands that there are some limits on the Court's ability to affect Mr. Al-Saadi's day-to-day experience in jail. But these issues, combined with the SAMs' limitations on his third-party communications, strain the attorney-client relationship, interfere with Mr. Al-Saadi's participation in his own defense, and subject him to punishment beyond what the Due Process Clause permits for pre-trial detainees. Accordingly, the defense respectfully requests that the Court at least implement the following changes.

---

[2] The defense understands that the white noise machine is used in the SAMs unit to restrict communications between detainees on the unit. However, the defense believes that Mr. Al-Saadi cannot otherwise communicate with anyone on the SAMs unit because nobody else there speaks Arabic.

*First*, the Court should permit one extra phone call in addition to those already scheduled to compensate for those that were improperly curtailed. In addition to providing Mr. Al-Saadi lost time with his family, it will appropriately require agents to exercise more care before terminating future calls. Right now, the executive branch appears to believe it can cut off Mr. Al-Saadi's limited contact with his family—and anyone outside the jail—without any consequence. The Court should make clear that is not true, and permitting an additional one-hour phone call to remedy previous improper curtailments would make that point.

*Second*, the Court should permit Mr. Al-Saadi access to a television with Arabic public news programming in his isolated cell, which defense counsel can help facilitate and provide. Mr. Al-Saadi is held under extreme and unusual isolation for a pretrial detainee, and an unusual remedy is entirely appropriate.

*Third*, the Court should make clear that the government's limits on Mr. Al-Saadi's dissemination of his own speech do not limit him from consuming information, including the news. At present, the government's position is that it may stop Mr. Al-Saadi's family from telling him about the news, about the war in and around their country, and from apprising him of what is going on in the world. It does not cite precedents permitting the government to cocoon a pretrial detainee and stop him from knowing basic information about the news, or in their family's affairs and finances, or otherwise *to consume* information. Even if the government is permitted to enforce some limitation on Mr. Al-Saadi's own speech—insofar as it does not curtail him from speaking about his own case, which it may not do—it should be admonished to let him consume outside information, including the news, without limit.

*Fourth*, the Court should require BOP to afford Mr. Al-Saadi kosher or halal meat and chicken options to purchase via commissary. The only kosher and/or halal "meat" options presently available via commissary are tuna and mackerel.

*Fifth*, the Court should direct the government to inform the defense when BOP receives non-legal reading materials and when the FBI has approved the items for Mr. Al-Saadi's receipt. This is necessary because without this requirement the defense has no other way of reliably keeping track of the materials once they are mailed.

## V. Conclusion

For the foregoing reasons, the Court should vacate or modify the SAMs and provide other relief to address Mr. Al-Saadi's conditions of confinement. The defense also requests an evidentiary hearing.

Respectfully submitted,

/s/

Andrew John Dalack, Esq.
Benjamin Silverman, Esq.
Hana Yamahiro, Esq.
Assistant Federal Defenders
Tel: (646) 315-1527

Cc: Counsel of record (by ECF)
Mohammad Al-Saadi (by legal mail)