UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA

v.

MOHAMMAD BAQER SAAD DAWOOD AL-SAADI

Defendant

---------------------------------------------------------------x

UNDER SEAL

26 Cr. 220 (CM)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO VACATE OR MODIFY SPECIAL ADMINISTRATIVE MEASURES AND SCHEDULING A CONFERENCE AND POTENTIAL HEARING PURSUANT TO *FARETTA v. CALIFORNIA*[1]**

McMahon, J.:

The defendant, Mohammad Baqer Saad Dawood Al-Saadi, was detained in Turkey on May 1, 2026, and presented in this district on May 15, 2026. Dkt. 14 at 4. After his arrest and presentment, the Government secured an eight-count Indictment on May 28, 2026. Dkt. 6. He was charged with conspiracy to provide material support to two terrorist organizations (Counts I and II), conspiracy to provide material support for acts of terrorism (Count III), provision of material support for terrorism (Count IV), attempted acts of terrorism transcending national boundaries (Count V), conspiracy to bomb a place of public use (Count VI), attempted destruction of property by means of fire or explosive (Count VII), and financing terrorism (Count VIII). He is currently detained at Brooklyn Metropolitan Detention Center ("MDC"). The Indictment alleges the following facts.

[1] This decision will be provided to the Government for review for the redaction of classified/non-public material from any public filing of this decision as well as excision from any public document or version of this opinion given to the defense of any grand jury material.

## THE INDICTMENT

Mr. Al-Saadi has served as a member and commander of Kat'aib Hizballah ("KH"), which the Government has designated a foreign terrorist organization since 2009. KH is responsible for attacks against the United States and other targets. Dkt. 6 at 1. After the United States and Israel launched airstrikes that killed various Iranian leaders, including its Supreme Leader, Mr. Al-Saadi directed individuals to "exact retribution" against the United States by killing U.S. citizens, and he "operated as a propagandist" for terrorist organizations. *Id.* at 2. In the months leading up to May 2026, Mr. Al-Saadi helped plan and direct at least 20 attacks and attempted attacks in Europe and the United States. *Id.*

The Government further alleges that Mr. Al-Saadi controlled social media accounts that distributed messages from an entity called Harakat Ashab al-Yamin al-Islamiya ("HAYI"), and that HAYI took credit for violent attacks against civilian targets across Europe. *Id.* at 5-7. At least twice, Mr. Al-Saadi participated in Facetime calls with an attacker as they conducted an attack. He also created and published propaganda videos related to HAYI's attacks. *Id.* at 7, 19, 22.

In April 2026, Mr. Al-Saadi contacted an individual in the United States to launch attacks here. That individual put Mr. Al-Saadi in contact with an undercover officer who posed as someone willing to execute Mr. Al-Saadi's directives. *Id.* at 7-8. Mr. Al-Saadi then directed and paid the undercover officer to attack sites within the United States. He sent the undercover officer targeting packages identifying three Jewish institutions in the United States. *Id.* at 8. Shortly after doing so, Mr. Al-Saadi was detained in Turkey. *Id.*

## PROCEDURAL BACKGROUND

Since he was first presented and detained in the United States, Mr. Al-Saadi has been placed in solitary confinement. Dkt. 14 at 5; Dkt. 27 at 1-2. On June 25, 2026, the Government

issued a memorandum imposing Special Administrative Measures ("SAMs") in connection with his incarceration, pursuant to its authority under 28 C.F.R. § 501.3.

Before the Court is Mr. Al-Saadi's motion to vacate, or in the alternative, modify the SAMs imposed on him.

Mr. Al-Saadi first argues that the SAMs, in their entirety, violate the Fifth, Sixth, and Eighth Amendments to the Constitution. Dkt. 14 at 9. His arguments center on the deprivations incurred due to his lack of contact visits with his attorney, his solitary confinement, and limitations on his phone calls with his family. He separately argues that he is entitled to certain protections under the Third Geneva Convention, *id.* at 7, but the parties have agreed to a separate briefing schedule for that aspect of his motion, and it will not be further addressed here.

In the alternative, Mr. Al-Saadi seeks to modify various provisions of the SAMs.

In its opposition, the Government argues that all of the SAMs are warranted because Mr. Al-Saadi presents a physical threat to others, because he believes he was justified in participating in his attacks against civilians (the attacks of which he is presumed innocent, I might add) and because allowing him unfettered communications with third parties would pose a threat to the public. Dkt. 24 at 13-14. In an *ex parte* filing, the Government contends that Mr. Al-Saadi has already violated the SAMs by attempting to use his limited phone calls with his family to send coded messages that could be passed to other criminals.

**THE CURRENT SAMS**

The Department of Justice relied on two rationales to impose SAMs: (1) Mr. Al-Saadi's "alleged relationship with senior FTO leaders" and (2) his "demonstrated ability to disseminate propaganda that explicitly calls for violence against Americans and others." Dkt. 14-1 at 4-5. Relying on these rationales, Todd Blanche, the then-Acting Attorney General (now the Attorney

General) stated that Mr. Al-Saadi is "believed to have demonstrated a high level of skill using electronic communications to direct or inspire deadly acts of terrorism." *Id.* at 4. Blanche underscored Mr. Al-Saadi's use of "social media applications" and "text messages, video calls, and chat-enabled applications, all of which he used to communicate directly with attackers to provide them with direction and/or facilitate the video recording of their attacks." *Id.* He then asserts, in conclusory fashion, "Based upon information provided to me of Al-Saadi's commitment to violence, I find that there is substantial risk that his communications or contacts with persons could result in death or seriously bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons." *Id.* at 5. This simply parrots the standard that authorizes the imposition of SAMs (*see infra*., p.7).

As a result of the SAMs, Mr. Al-Saadi is in solitary confinement and has been for the entirety of the time he has been in custody of the BoP. Paragraph 1 (c)-(d) and Paragraph 6 prohibit him from sharing a cell with another inmate and prevent him from "communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates." *Id.* at 5-6, 15.[2] Mr. Al-Saadi's counsel explained that, in addition to being in solitary confinement, the defendant is subjected to a "white noise machine that plays all day long that interferes with his sleep, [and it] interferes with his ability…to pay attention to the discovery that he's reviewing." Transcript of hearing held Sept. 9, 2026 ("9/9 Tr.") at page 5, lines 5-8. The SAMs permit Mr. Al-Saadi's immediate family members to visit him in person, but that provision affords him no comfort, because his family is located overseas. Dkt. 14-1 at 12-13. According to defense counsel,

---

[2] Counsel represents and the Government does not contend otherwise, that Mr. Al-Saadi does not speak English or Spanish or any language commonly heard at the MDC – he speaks Arabic, and perhaps Farsi—so even if he could speak or write to other inmates, he would have great difficulty making himself understood.

whenever he is not meeting with counsel, or on a call with his family, "He sits alone on the floor of his call, isolated, and often without reading material." Dkt. 27 at 2.

Under Section 2(c), the Government maintains the discretion to determine whether privileged attorney-client visits will be contact or non-contact. Dkt. 14-1 at 8. According to Mr. Al-Saadi's counsel, the Government has not yet permitted counsel to have a contact visit with their client at the MDC. Hearing Tr., 9/9/26, at 6:2-3. As a result, Mr. Al-Saadi and his counsel cannot physically pass discovery material between each other, and their visits are conducted through "the veil of a rather obstructive metal screen and then a glass window." *Id.* at 6:9-12; *see also* Hearing Tr., 6/1/2026 at 11:11-23. Mr. Al-Saadi has been given an air-gapped laptop to review discovery material, but he is prohibited from bringing the computer to meetings with his counsel, which limits its utility. Dkt. 30 at 1.

This is not the first time I have addressed SAMs in this case. Under Paragraph 3(g), non-legal mail sent to Mr. Al-Saadi (even by his counsel) must be first reviewed by the FBI before it is approved for release to Mr. Al-Saadi. Dkt. 14-1 at 13-15. If the FBI approves the mail for release, it is then forwarded to the BoP for delivery to Mr. Al-Saadi. Mr. Al-Saadi's counsel explained that, even though the FBI can quickly review and approve the non-legal material he sends to Mr. Al-Saadi, the Bureau of Prisons inexplicably delays delivering the mail to his client. Dkt. 12; Hearing Tr., 9/9/26, at 10-11; Dkt. 27 at 6. For example, one set of books in the Arabic language that was delivered to the MDC for the FBI's review on August 3, 2026 – and was approved for dissemination to the defendant just a couple of days later – did not arrive at his cell until August 25. Hearing Tr., 9/9/26, at 10-11. Mr. Al-Saadi's counsel requested, and I granted, an order requiring that the MDC deliver non-legal material to Mr. Al-Saadi within 48 hours of its approval by the FBI. Dkt. 18-1; Dkt. 22. According to his counsel, the BoP has repeatedly violated

this order, and he has "received only three of the many books and PDFs" sent to him weekly. Dkt. 27 at 6.

Mr. Al-Saadi has also had trouble with an issue not explicitly discussed in the SAMs – understanding the sheet for the Commissary orders at the MDC. The Commissary order sheet for the MDC is in English, a language Mr. Al-Saadi does not understand. Mr. Al-Saadi's counsel asked me for permission to be able to work with a translator to translate it into Arabic. I granted that request, too. *See* Hearing Tr., 6/1/26, at 12.

## LEGAL STANDARD

Under 28 C.F.R. § 501.3(a), the Attorney General may direct the Bureau of Prisons to implement SAMs that are "reasonably necessary to protect persons against the risk of death or seriously bodily injury." These measures "ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." *Id.* These measures require a finding that there "is" a "substantial risk" that a prisoner's "communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or seriously bodily injury to persons." *Id.*

At this early stage of Mr. Al-Saadi's proceedings, when there has been no adjudication of the charges lodged against the defendant and Mr. Al-Saadi is presumed innocent, the Constitution's Due Process clause prohibits the Government from taking punitive measures against him. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). When an unconvicted detainee challenges a prison regulation, the Supreme Court directs courts to determine whether the regulation is imposed for

the impermissible purpose of punishment, or "whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. Any particular SAM that is "reasonably related to a legitimate governmental objective…does not, without more, amount to 'punishment.'" *Id.* at 539.

*Bell* illustrated the point with a hypothetical prison practice that served a legitimate governmental objective but was not reasonably related to it. Acknowledging that the Government has a legitimate interest in ensuring a detainee's presence at trial, *Bell* considered that the government might load him "with chains and shackles" and toss him "in a dungeon" to accomplish that objective. But such "harsh" conditions would "support a conclusion" that their purpose was "to punish," especially because the government's objectives "could be accomplished in so many alternative and less harsh methods." *Id.* at 539 n.20.

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court elaborated on *Bell* and announced a rule that applies to any infringement on "inmates' constitutional rights," without distinguishing between those who have been convicted and those still cloaked with the presumption of innocence. *Id.* at 89. A regulation that "impinges on inmates' constitutional rights" is valid only "if it is reasonably related to legitimate penological interests." *Id.* To make that determination, courts apply a four-factor test: (1) whether there is a "valid, rational connection" between the regulation and the legitimate governmental interest used to justify it; (2) whether there are alternative means for the prisoner to exercise the right at issue; (3) the impact that the desired accommodation will have on guards, other inmates, and prison resources; and (4) as in *Bell,* the absence of "ready alternatives." *Id.* at 89-91.

For the following reasons, Mr. Al-Saadi's motion is GRANTED insofar as he seeks to have meaningful (i.e., contact) visits with his attorneys, so that he and they can prepare for trial in a manner consistent with his Sixth Amendment right to counsel. The motion is DENIED insofar as

he asks for commissary and entertainment privileges different from and greater than those provided to other similarly situated detainees. As for the issue of the number of telephone calls the defendant is permitted to have with the members of his family each month, the Government must make a further showing, addressing specifically the relevant legal factors set forth in the Supreme Court's decisions in *Bell* and *Turner*, before the court can make a ruling. The same is true with respect to the defendant's motion to be placed in the general population.

**APPLICATION TO MR. AL-SAADI**

The Government believes that, "even while detained pending trial," Mr. Al-Saadi poses a danger because of (1) the "vast and global nature" of the terrorist organizations he supports; (2) the "nearly 20 actual terrorist attacks" that he (allegedly) facilitated and promoted; (3) his documented encouragement of others to attack American and Israeli interests; (4) his "extensive use of social media, electronic devices, and encrypted messaging applications;" and (5) his ongoing desire to commit acts of terror in the U.S. and abroad. Dkt. 24 at 1-2. The Government made no effort to defend the SAMs with reference to the standards set out in *Bell* or *Turner*, although it does not contest that those standards apply. Dkt. 24. At bottom, the Government argues, "He's a terrorist, we know he's a terrorist, and he's like all other terrorists, so what more could the Court possibly need to know?" *Id.* at 12-15.

The Government's interest in preventing terrorist attacks and limiting Mr. Al-Saadi's communications with potential co-conspirators is clearly legitimate, and there are undoubtedly penological measures that can and must be taken to ensure that this does not happen. But the Government has not bothered to demonstrate that either preventing Mr. Al-Saadi from having contact visits with his counsel from the Federal Defenders of New York, or limiting him to just one telephone call with his family members each month (when there is literally no one else, aside

from counsel's translator, with whom he can communicate) is "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

## I. Non-contact visits with counsel

Paragraph 2(c) of the SAMs allows the Government to decide whether meetings at the MDC between the defendant and his attorneys from the Federal Defenders of New York will be contact or non-contact. Dkt. 14-1 at 8. According to Mr. Al-Saadi, he has not been allowed a contact visit with his counsel at the MDC. Both he and his attorneys argue that this prevents them from meaningfully preparing for motions and trial, which is a violation of his Sixth Amendment right to the assistance of counsel— the meaningful assistance of counsel.

The Government does not justify why it should prohibit Mr. Al-Saadi from having contact visits with his attorney. It has never been argued that Mr. Al-Saadi poses a danger to his attorneys. I have no reason to believe that his attorneys from the Federal Defenders might use the fact that they are sitting next to their client to help him commit a crime; the Government has not provided me with any evidence that these experienced lawyers cannot be trusted not to smuggle contraband into their client or smuggle out anything that Mr. Al-Saadi ought not be sending into the world. As such, this measure fails the first *Turner* requirement that it have a "valid, rational connection" to the government's legitimate interest in preventing attacks. 482 U.S. at 89.

The second and third *Turner* factors also weigh in Mr. Al-Saadi's favor. *Turner*'s second factor requires me to consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Mr. Al-Saadi's counsel has credibly stated that the non-contact policy has impaired the ability of Federal Defenders of New York to provide their client with effective counsel. The conditions imposed on his attorney visits virtually ensure that counsel and client cannot meaningfully work together: Mr. Al-Saadi and his counsel cannot pass discovery

materials back and forth; their visits are conducted through "the veil of a rather obstructive metal screen and then a glass window." Hearing Tr., 9/9/26, at 6:9-12; Hearing Tr., 6/1/26, at 11:11-13; and Mr. Al-Saadi cannot bring the laptop that he uses to review documents to his meeting with counsel – which, given the fact that they cannot use hard copies, means he really cannot review his discovery materials with his lawyers at all. The Government may think that allowing the attorneys and the defendant to find themselves in proximity to one another is sufficient to satisfy the Sixth Amendment; the court thinks otherwise.[3]

Nor has the Government asserted, under *Turner*'s third factor, that a contact visit would have any effect on "fellow inmates or on prison staff." 482 U.S. at 90. Unlike in the case of Joaquin Guzman Loera, a/k/a "El Chapo," the Government has not argued that contact visits must be prohibited because there are cords and pipes on the attorney side of the room that Mr. Al-Saadi could use to harm himself and trigger a trip to the hospital and an escape attempt. *See United States v. Loera*, 09-CR-466 (BMC) (RM), ECF 91-1 at 4. Nor has the Government argued, as it did about Guzman, that this defendant might activate "emergency sprinklers" on the attorney's side of the room, which might "make the room slippery" and would facilitate defendant's evasion of correction officers. *Id.* [4] Unlike Guzman, Al-Saadi has no demonstrated history of escape attempts (some of Guzman's, notoriously successful).

Under the fourth *Turner* factor, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." 482 U.S. at 90. The Government has never argued that it lacks the facilities or the personnel to provide client-counsel contact visits that would not present

[3] This particular SAM has apparently so impaired the defendant's ability to develop a relationship with his lawyers that Mr. Al Saadi is contemplating the possibility of representing himself.

[4] Mr. Guzman was being held in the now-closed Metropolitan Correctional Center (MCC)— not at the MDC. The court cannot presume that the two facilities are comparable in this particular respect.

a danger to the defendant, his lawyers or anyone else. The MDC has rooms for contact visits. *See* Tr., 9/9/26, at 6:3-7 (Mr. Al-Saadi's attorney explaining that "in the ordinary course when I meet with my clients at the MDC, I can shake their hand, I can give them a hug, I can bring them some food from the vending machine to make hours long meetings a little bit more palatable."). There is no evidence that the conditions in these rooms are such that those visits would be unsafe for anyone.

In short, the Government's dictate that visits between client and counsel be conducted in a non-contact manner that prevents them from engaging in meaningful trial preparation is an "exaggerated response" to purported security concerns that have not been justified with any evidence. *Turner*, 482 U.S. at 90. This practice, which infringes upon Mr. Al-Saadi's Sixth Amendment right to counsel, must cease. I am granting Mr. Al-Saadi's motion insofar as he asks to be allowed to have contact visits with his counsel, effective immediately. These visits must permit the defendant and his attorneys to conduct a meaningful review of documents and other discovery materials— something that is clearly not happening under the current circumstances.

## II. Limitations on the Number of Phone Calls Between Mr. Al-Saadi's and his Family.

Paragraph 3(a) of the SAMs permits Mr. Al-Saadi to call only his immediate family members, who are defined as his spouse, children, parents, and siblings. Paragraph 3(b) states that those calls are not to be overhead by a third party, divulged in any manner to a third party, or recorded or preserved in any manner. Dkt. 14-1 at 11.

Each such call is, however, contemporaneously monitored and recorded by the FBI. Under Paragraph 3(e), if the FBI monitoring reveals "any indication" that Mr. Al-Saadi is discussing illegal activity, soliciting or encouraging acts of violence, or attempting to circumvent the SAMs,

then the FBI may cut the call and prohibit Mr. Al-Saadi from communicating with his family "for a period of time" the length of which the Government will determine. *Id.* at 12.

The record is not clear how many family calls Mr. Al-Saadi has been allowed since he has been detained. At the September conference, defendant's attorney complained that, while his client had been allowed to make several video calls, only one of the calls lasted the full two-hour duration, because the calls were repeatedly interrupted and cut off by the FBI, without explanation. But at least he was able to hear the voices of his loved ones, who cannot visit the defendant – no matter that such visits are "permitted" under the SAMs – because they are not in the United States.

As of October 19, 2026, however, the Government has decided to limit Mr. Al-Saadi to a single hour-long phone call with his family each month. Dkt. 29 at 1. In a publicly filed document, the Government justified this decision by alleging that Mr. Al-Saadi used "coded language" when he referred to "work" or "a job" on a phone call with his family, and that his sister was using code when she referred to "the number of pages in issue number four and number five of a certain magazine." Dkt. 24 at 10-11. [In an *ex parte* filing filed in further justification of this particular decision, the Government revealed grand jury materials relating to two individuals who were allegedly involved in planning certain terrorist attacks with which the defendant was involved – including specifically the recent attack against the Royal Air Force base in Fairford ("RAF Fairford"), England, where U.S. bombers were stationed.[5] According to the Government, Mr. Al-Saadi referred to these two individuals in a coded manner in a conversations held with members of his family, including calls made on June 29 and September 24, 2026. UNDER SEAL.]

The problems with the Government's argument are two.

---

[5] [This attack was foiled before it could take place; it was stopped three months after the defendant was placed in solitary confinement at the MDC. UNDER SEAL.]

First, when implementing the SAMs condition placing limits on defendant's speech, the Government must demonstrate that the conversations interfered with are linked to "discrete criminal planning or conduct." *See United States v. Basciano*, 369 F. Supp. 2d 344, 351 (E.D.N.Y. 2005); *id.* ("While the recordings clearly demonstrate Basciano's willingness to violate prison rules in order to communicate with other members of the Bonnano family, I find that those violations do not justify indefinite placement in administrative detention because the government has not linked these infractions to discrete criminal planning or conduct of any kind."). The Government's argument about defendant's using coded language during his video calls with family members to communicate with his FTO confederates is vague and does not appear to be linked to discrete criminal planning or conduct. The Court needs to hear more.

Second, even if it were to surmount the first hurdle, the Government must also justify why limiting the number of conversations the defendant can have with his family members to one a month – a measure that on its face appears to be punitive – is the only way that the Government can prevent Mr. Al-Saadi from getting his ostensibly coded messages out. Coded messages can be transmitted as effectively in a single monthly call as they can in weekly calls. And the Government does not explain why its practice of monitoring calls and cutting them off if and when the conversation gets too suspicious for the FBI's liking is not a sufficient measure to prevent the dissemination of messages to the outside world – especially where, as here, family calls are literally the only human contact this particular defendant has.

In short, if the Government wants to justify this particular measure and establish that it is not in fact punitive, it must do a better job – and do so in light of the holdings in *Bell* and *Turner*. Before entering any final order directed to the number of telephone calls Mr. Al-Saadi can receive from his family members, I will allow the Government ten days to make a proffer as to why one a

month satisfies any legitimate penological objective or affords any more and better protection to the public than would some less restrictive practice. It would be helpful if the court were advised what about the various communications that have caused the FBI to end conversations caused the Government to believe that the defendant and his family were speaking in some sort of code when they referred to "work" or a "job" or an issue of a magazine.

## III. Solitary Confinement

Paragraph 1 (c)-(d) and Paragraph 6 prohibit Mr. Al-Saadi from sharing a cell with another inmate and prevent him from "communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates." Dkt. 14-1 at 5-6, 15. The Government's lead argument is that Mr. Al-Saadi "undoubtedly" and "without question" "presents a physical threat to others." Dkt. 24 at 13. To support that claim, it points to its allegations about Mr. Al-Saadi's pre-detention behavior – he purportedly "personally coordinated and/or promoted" bombings, arson and a near-fatal stabbing. *Id.* He also used "social media, cellphone communications, encrypted messaging applications, and militia-aligned media platforms" to encourage others to commit crimes. *Id.* at 15. His "external communications," moreover, "are a distressing and dangerous source of propaganda including violent calls to radical militants." *Id.* at 14.

More than thirty years ago, Judge Leo Glasser of our sister court in Brooklyn faulted the Government for arguing that solitary confinement was justified merely because a defendant had been accused of serious crimes, including murder, conspiracy and solicitation to murder, and obstruction of justice. "The inevitable and erroneous conclusion," of the Government's logic, "is that every defendant indicted for murder or witness tampering should be placed" in solitary confinement. *United States v. Gotti*, 755 F. Supp. 1159, 1165 (E.D.N.Y. 1991). On the record

before me, there "is little or nothing that distinguishes" Mr. Al-Saadi "from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained." *See United States v. Basciano*, 369 F. Supp. 2d 344, 351 (E.D.N.Y. 2005) (emphasis in original); *id.* at 352 (solitary confinement is not justified without "substantial proof" that the defendant "committed these crimes *while in pre-trial detention*.") (Emphasis added).

*Basciano* is an instructive case. The defendant was alleged to be a member of La Cosa Nostra—the Mafia. In support of its decision to place Basciano in solitary confinement, the government submitted to the court, under seal, two consensual recordings that were purported to capture a couple of lengthy jailhouse conversations between Joseph Massino, the reputed boss of the Bonnano family, and Basciano. "The topics discussed by the two men, whose voices are heard on these recordings, include various aspects of the continuing operations of the Bonnano family, including the methods they have employed to pass messages to operatives outside the prison. These methods include using family members, investigators, and attorneys to send and receive messages, and taking advantage of mob relationships with prison guards to make unmonitored phone calls. Basciano and Massino also returned repeatedly to the dual subjects of the indictment in the instant case, with Massino doggedly questioning Basciano about his knowledge of the circumstances surrounding Pizzolo's death, and whether he had told anybody about an earlier, unrecorded, conversation between the two in which a proposal to harm a federal prosecutor apparently was raised." *Id.* at 347.

Nonetheless, Judge Garaufis concluded that, without additional information, it would not be appropriate to confine Basciano to solitary:

> Indefinite detention in the SHU is an exceptionally harsh method of preventing a detainee from communicating with his alleged criminal associates. Accordingly, it must be reserved for the most extreme cases. In finding that the instant case does not present such circumstances, I in no

> way seek to diminish the seriousness of the allegations raised against Basciano or denigrate the government's interest in preventing individuals from furthering the activities of active criminal organizations while in pre-trial detention. However, on the record before me, I conclude that the government has not made a sufficient showing that Basciano was engaged in planning acts of violence while in pre-trial detention. Without that nexus to the institutional needs of the BOP or to the purposes of the Bail Reform Act, there is little or nothing that distinguishes Mr. Basciano from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained. Further, while the recordings clearly demonstrate Basciano's willingness to violate prison rules in order to communicate with other members of the Bonnano family, I find that those violations do not justify indefinite placement in administrative detention because the government has not linked these infractions to discrete criminal planning or conduct of any kind."

*Id.* at 351 (emphasis in original). Interestingly, and of great significance, Judge Garaufis reconsidered his decision after the Government presented him with additional evidence of plans to commit discrete crimes; specifically, a conspiracy to murder various individuals, including the prosecutors and Judge Garaufis himself. *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 446 (E.D.N.Y. 2008) ("I agree with [the Magistrate Judge who issued a Report and Recommendation on Basciano's challenge to the Government's decision to return Basciano to solitary confinement, *Basciano v. Martinez*, No. 07CV421(NGG)(RML), 2007 WL 2119908 (E.D.N.Y. May 25, 2007)] that there is ample evidence to support the conclusion that Basciano has sought to conduct criminal activity, including acts of violence, from prison. I emphasize from the start that the Government has offered evidence not of a single such instance, but rather of a pattern of discussions and actions that suggest an intent to cause harm to individuals and conduct criminal activity from inside the prison walls.").

Given the allegations in the Indictment, I do not question the legitimacy of the Government's interest in limiting Mr. Al-Saadi's contact with the outside world. But the Government cannot rest on the Indictment to restrict the defendant from having human contact in

the jail. It is certainly possible that the Government can explain how a man who does not speak English, and who is not allowed access to the internet, can wreak the havoc that allegedly justifies its decision to keep him separate from the rest of the MDC population. But the Government needs to make its case – not simply say, "We allege that he is a terrorist and therefore we can isolate him throughout his pre-trial detention." As of today, that is all the Government has done.

While the Second Circuit has acknowledged that the "negative effects of solitary confinement" are "devastating" and "well-documented," *Walker v. Bellnier*, 146 F.4th 228, 238 (2d Cir. 2025); *id.* (referring to the U.N. Special Rapporteur on Torture's conclusion that solitary confinement "itself can amount to…torture as defined in article 1 of the Convention against Torture."), there are plenty of cases in which courts have held that the Government has made a sufficient showing to justify keeping a pre-trial detainee in solitary confinement. For example, in *United States v. Guzman Loera*, 24 F.4th 144, 153-55 (2d Cir. 2022), the decision to keep the notorious drug lord known as "El Chapo" in solitary confinement was justified because he had bribed prison officials in Mexico and twice escaped from Mexican prison, including once "under 24-hour video surveillance in solitary confinement." In *United States v. Felipe*, 148 F.3d 101, 111 (2d Cir. 1998), solitary confinement was deemed appropriate because the defendant had directed crimes from his jail cell. I acknowledge that it might be possible for the Government to make the necessary showing here in this case.

Furthermore, this is not my first case involving prisons in general or the MDC in particular. I am not insensible to the fact that – whatever the rules might be[6] – contraband, including phones

[6] It is the court's understanding that inmates in the general population do not have access to the internet, and they are limited to a prison e-mail system that is "monitored and reviewed" by staff. U.S. Dep't of Just., *Attorney Guide to the Metropolitan Detention Center, Brooklyn, New York* 20 (Nov. 2025), https://perma.cc/ZF86-G4HL. And of course, there are rules that prohibit the introduction of drugs and weapons and other forms of contraband into any detention center.

and even weapons, does circulate within jails. I can even envision arguments that the Government might make about why it would not be appropriate to place this particular defendant in the general population, especially given the legitimate restrictions on his ability to communicate with the outside world.

But as I keep reminding Assistant United States Attorneys (indeed, as I once or twice reminded the Attorney General himself, in a former life), the Court does not work for the Department of Justice. It is not my job to make the Government's case for it by imagining things that it might say to justify its decision to place this defendant in solitary confinement. Rather, it is the Government's job to make the case for a draconian measure like solitary confinement. And here, it has not even come close to demonstrating that Ms. Al-Saadi has (like Basciano) "clearly demonstrate[d]" a willingness to flout prison rules in a manner that would justify isolating him from human contact, aside from his contact with his attorneys. *Basciano*, 369 F. Supp. 2d at 351. I don't say the Government cannot do it; I say only that the Government has not yet done it.

The Government has ten days to submit a motion explaining why its decision to keep Mr. Al-Saadi in solitary confinement satisfies *Turner*'s four-factor test and that his communications present a "substantial risk" of "death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." 28 C.F.R. § 501.3(a).

## IV. Other Issues Raised by the Defendant's Motion

Mr. Al-Saadi asks for five specific changes to the text of the SAMs.

*Paragraph 2(h) Documents Provided by Attorney to Inmate*

Defendant argues that because Paragraph 2(h) explicitly mentions "discovery materials" and "court papers" as examples of documents that his counsel can share with him, it "creates

ambiguity" as to whether his counsel can share other documents with him. Dkt. 14 at 12. He asks the Court to give his attorneys, as officers of the court, discretion to share materials with him that they believe are necessary to his defense.

The Government objects to the proposed modifications to Paragraph (2)(h). It believes the "including" language provides illustrative examples, and as already written, does not purport to encompass all types of documents that the defendant is allowed to review with his counsel that are relevant to his defense. Dkt. 24 at 16.

The key phrase in counsel's request is "officers of the court." The Court has every confidence that Messrs. Dalack and Silverman—two very fine attorneys with the court's esteemed Office of the Federal Defender, both of whom have been granted the highest of security clearances by the DoJ—will honor their oath as officers of the court and will share with defendant only that which is necessary in order to defend against the pending charges. The amendment is unnecessary.

*Paragraph 2(h)(i) Limiting Nature of Documents Provided to Inmate*

Paragraph 2(h)(i) prohibits counsel from sharing "inflammatory materials" with defendant. Counsel asks that that term be removed because "it does not provide a meaningful standard which his counsel can apply to distinguish prohibited from permissible material." Dkt. 14 at 12. The Government objects to the defendant's proposed modification, but to assuage defendant's ambiguity concern, agrees to the inclusion of a clarifying coda at the end the paragraph: "Nothing in this paragraph limits the defendant's ability to review with his counsel discovery materials produced by the Government, in accordance with the designations that such materials are marked pursuant to the Protective Order in this case." Dkt. 24 at 16.

The Government's solution does not address counsel's concern. For instance: What if counsel believed it important to show and ask his client questions about a New York Times article

about terrorist operations within the theater of operation referred to in the Indictment, which article includes reporting about inflammatory jihadist threats. Does Paragraph 2(h)(i) preclude counsel from showing that hypothetical article to his client? That is not at all clear.

Counsel must be permitted to use their discretion when sharing documents with Mr. Al-Saadi. I trust – as officers of the court – counsel will not be gratuitously sharing inflammatory material with their client. As long as counsel is providing defendant with material to review in furtherance of his defense counsel cannot be in violation of this paragraph. With that clarification, the paragraph stands as written.

*Paragraph 2(h)(ii) Additional Documents Allowed to be Provided to Inmate*

Paragraph 2(h)(ii) provides for the USA/SDNY to authorize additional documents to be presented to the defendant without the need to formally seek approval for an amendment to the SAM. The defense asks that language be included at the end of this paragraph that allows counsel to request, *ex parte,* leave of court to view material arguably barred by the SAMs: "If USA/SDNY does not approve a request, defense counsel may seek leave of the court, including, if appropriate, on an *ex parte* basis." *See* Dkt. 14-2 at 10. (Defendant's Redline of SAMs Order).

The Government consents to the defendant's proposed additional sentence, with the exception that the Government does not agree with the inclusion of the language ". . . including, if appropriate, on an ex parte, basis." The Governments position is that if, after conferring with the defense, the Government does not approve of the defendant's request in the first instance, and the defendant then seeks leave of the Court, the Government should be permitted an opportunity to provide its position to the Court regarding why it believes those specific documents should not be permitted to be presented to the defendant under the SAMs. Dkt. 24 at 16.

The Court agrees with the Government's formulation— the SAMs will be amended accordingly.

*Paragraph (3)(b) Regarding Rules for Telephone Calls*

Paragraph (3)(b) governs all non-legally privileged telephone calls or communications (i.e., calls other than those between defendant and his attorneys). Counsel asks that the section be amended by adding language that neither defendant nor counsel is responsible if a third party (presumably referring to persons other than the Government) "outside of their control" listen in on defendant's calls or communications. Dkt. 14 at 13.

The Government believes that this SAM provision, as written, already appropriately protects against the possibility of the defendant's family members permitting others to overhear and/or record their telephone calls, and no modification should be made. Dkt. 24 at 16.

The defendant's proposed language is therefore unnecessary.

*Paragraph (3)(e) Improper Communications*

Paragraph (3)(e) states: "If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by the USMS/BOP/DF." Defendant claims that the Government used this provision to improperly terminate a family phone call on July 13, 2026, after Mr. Al-Saadi asked his family to raise awareness about his plight in Iraq and Iran, to encourage leadership in those countries to demand his release. To guard against this happening again, defendant asks that the following sentence be added to the end of Paragraph (3)(e): "Nothing in this provision shall preclude discussing public advocacy on behalf of a detained individual,

including raising public awareness about the unlawful grounds for that person's capture and detention in the United States." Dkt. 14-2 at 13.

The Government says the defendant has gotten it all wrong. It claims that "to the extent the FBI terminated any call, it did so out of a genuine concern that the defendant was using the calls to violate the SAMs, specifically by enlisting third parties to engage in certain conduct, including possibly additional criminal acts, including planning or even carrying out more attacks such as the European Terrorist Attacks." Dkt. 24 at 17. The Government claims that, on several calls that were terminated, the defendant has inquired of his family regarding their communications with known terrorists on his behalf, discussed transferring large sums of money to unknown individuals in Iraq, and discussed calling on others to do unspecified "work," which the FBI reasonably believes could refer to additional terrorist acts. *Id.* at 10-11. The Government argues that the defendant's proposed language will create enormous strain on the FBI to try to further decipher the defendant's intentions when giving these instructions to his family members. *Id.* at 17.

Shocked that the defendant would even make such a request, the Government further argues that the proposed addition to this paragraph by the defense "remarkably and erroneously assumes that advocacy about the defendant's 'unlawful . . . capture and detention in the United States,' should be permitted, where there is nothing remotely unlawful about it." *Id.* The Government is essentially arguing here that defendant should be prohibited from seeking advocacy for his case because, hey, he is guilty:

> To the contrary, the defendant is a terrorist who attempted to kill Jews and Americans around the world, including in the United States. His violent plots were interrupted only after he was detained and prevented from directing others in the way the SAMs now seek to prevent. The "advocacy" for which this proposed modification is intended to advance would directly permit propaganda and misinformation feeding the defendant's terrorist

> goals to incite others to commit violence in his name. The Government, therefore, objects to this proposed modification.

*Id.*

The Government's more tempered argument is that it believes it has an incredibly strong case that defendant committed the charged offenses. (Indeed, the Government represents that Mr. Al Saadi made post-arrest statements admitting to much of the charged conduct.) It urges what to the casual listener might sound like an innocuous request by defendant to enlist legal support for his case, is instead, to the ears of a trained counter terrorist FBI agent, a likely attempt by defendant to communicate with his FTO confederates.

The Court declines to second guess the FBI in this regard. Paragraph 3(e) remains as written.

*Creature Comforts*

There are few "creature comforts" for inmates in MDC's general population, and even fewer for an inmate placed in that institution's SHU and subject to SAMs.

Mr. Al-Saadi asks that he be provided with a television with Arabic language programming. He would like to be allowed more phone calls with his relatives. He would like permission to purchase additional food from the commissary. He asks for clarification that the SAMs do not limit his consumption of information, including specifically the news. He wants a court order requiring BoP to provide him with "kosher or halal meat and chicken options to purchase via the commissary. And he seeks a court order requiring the Government to inform his counsel when the BOP has received non-legal reading items, and when the FBI has approved them. Dkt. 14 at 14-15; Dkt. 27 at 8.

The Court is reluctant to get into the weeds of Mr. Al-Saadi's conditions of confinement—Food choices, commissary access, and the like are generally, and appropriately, the province of

the BoP. However, counsel argues that because of the Special Administrative Measures his client cannot access the resources and services that are allowed inmates in the general population. As a threshold matter, it is the Court's expectation that Mr. Al-Saadi will receive the same sustenance—access to kosher or halal meat and chicken meals—as inmates in the general population. He is entitled to nothing more, but also nothing less. And that holds for access to commissary items, as well.

Regarding defendant's requests for greater access to written material and television, those requests are governed by the SAMs.[7] The Government has 10 days to explain why denying defendant's access to information about life outside prison walls is an appropriate special administrative measure. The Government is also to provide an update on what is being done to resolve the apparent lag time in the FBI's vetting of non-legal reading material.

## V. Faretta Hearing

In a letter to the court dated, October 29, 2026, the Federal Defenders ask that the "Court schedule a conference to address Mr. Al-Saadi's desire to represent himself; to discuss what that would entail given his SAMs; and to allocute Mr. Al-Saadi as required under *Faretta v. California*, 422 U.S. 806 (1975)." Dkt. 31. According to counsel, the implementation of SAMs has left Mr. Al Saadi feeling isolated and frustrated, has strained the attorney-client relationship, and ultimately led defendant to believe that he may as well represent himself. *Id.*

I am hopeful that the Court-ordered relaxation of the restrictions on contact visits between client and counsel will obviate the need for a *Faretta* hearing. Nonetheless, the Court will hold a

[7] The Court is not inclined to give defendant his own personal television if such would not be provided to other similarly situated inmates.

conference, Thursday, November 19, 2026, at 2:30 p.m. If the defendant is still interested in self-representation, we will address the issue then.

This constitutes the decision and order of the Court.

November 2, 2026

U.S.D.J.